Argued and submitted January 11, decision of the Court of Appeals and order of the
Land Use Board of Appeals affirmed July 1, 1993

John T. DOLAN
and Florence Dolan,
*Petitioners on Review,*

*v.*

CITY OF TIGARD,
*Respondent on Review.*

(LUBA 91-161; CA A73769; SC S39393)

854 P2d 437

David B. Smith, Tigard, argued the cause and filed the petition for petitioners on review.

James M. Coleman, of O'Donnell, Ramis, Crew & Corrigan, Portland, argued the cause and filed the response for respondent on review.

Daniel J. Popeo and Paul D. Kamenar, Washington, D.C., and Gregory S. Hathaway, of Garvey, Schubert & Barer, Portland, filed a brief *amicus curiae* for Washington Legal Foundation.

Timothy J. Sercombe and Edward J. Sullivan, of Preston, Thorgrimson, Shidler, Gates, & Ellis, Portland, filed a brief *amicus curiae* for 1000 Friends of Oregon.

Ronald A. Zumbrun and Robin L. Rivett, Sacramento, California, and Richard M. Stephens, Bellevue, Washington, filed a brief *amicus curiae* for Pacific Legal Foundation.

VAN HOOMISSEN, J.

Peterson, J., dissented and filed an opinion.

## VAN HOOMISSEN, J.

Petitioners in this land use case seek review of a Court of Appeals' decision affirming a Final Opinion and Order of the Land Use Board of Appeals (LUBA) in favor of respondent City of Tigard (city). *Dolan v. City of Tigard,* 113 Or App 162, 832 P2d 853 (1992). The issue is whether city has demonstrated the required relationship between the conditions that it attached to its approval of petitioners' proposed land use and the expected impacts of that land use.[1] Petitioners argue that, because city failed to demonstrate an "essential nexus" or a "substantial relationship" between the exactions demanded by city and the impacts caused by their proposed development, city's exactions constitute a "taking" under the Fifth Amendment of the federal constitution.[2] City responds that it need only show a "reasonable relationship" between the imposition of the conditions and the legitimate public interest advanced. For the reasons that follow, we affirm the Court of Appeals' decision.

Petitioners own 1.67 acres of land in downtown Tigard. The land is within city's "central business district" zone and is subject to an "action area" overlay zone (CBD-AA zone). The land's current use is as a retail electric and plumbing supply business, a general retail sales use.

Petitioners applied to city for a permit to remove an existing 9,700-square foot building and to construct a 17,600-square foot building in which to relocate the electric and

---

[1] In land-use cases, this sometimes is called the relationship between the "exactions" and the "impacts."

[2] The Takings Clause of the Fifth Amendment to the Constitution of the United States provides:

"[N]or shall private property be taken for public use, without just compensation."

That Clause is made applicable to the states by the Due Process Clause of the Fourteenth Amendment. *Penn Central Trans. Co. v. New York City,* 438 US 104, 122, 98 S Ct 2646, 57 L Ed 2d 631 (1978). *See* Annot, *Supreme Court's View As to What Constitutes a "Taking" Within Meaning of Fifth Amendment's Prohibition Against Taking of Private Property For Public Use Without Just Compensation,* 89 L Ed 2d 977 (1988).

Petitioners also brought a challenge under Article I, section 18, of the Oregon Constitution (Takings Clause). Before this court, however, they expressly have limited themselves to a federal claim. Therefore, we do not address any Oregon constitutional issue.

plumbing supply business and to expand their parking lot (phase I). Petitioners eventually intend to build an additional structure and to provide more parking on the site (phase II); however, the exact nature of that additional expansion is not specified. Petitioners' proposed intensified use (phase I) is permitted outright in the CBD zone; however, the AA overlay zone, which implements the policies of the Tigard Community Development Code, allows city to attach conditions to the development in order to provide for projected transportation and public facility needs.

City granted petitioners' application, but required as conditions that petitioners dedicate the portion of their property lying within the 100-year floodplain for improvement of a storm drainage system and, further, that they dedicate an additional 15-foot strip of land adjacent to the floodplain as a pedestrian/bicycle pathway.[3] Petitioners sought a variance from those conditions, which city denied.[4]

In its 27-page final order, city made the following pertinent findings that petitioners do not challenge concerning the relationship between the dedication conditions and the anticipated impacts of petitioners' project:

"*Analysis of Variance Request.* The [City of Tigard Planning] Commission does not find that the requirements for dedication of the area adjacent to the floodplain for greenway purposes and for construction of a pedestrian/bicycle pathway constitute a taking of applicant's property. Instead, the Commission finds that the dedication and pathway construction are reasonably related to the applicant's request to intensify the development of this site with a general retail sales use, at first, and other uses to be added later. It is reasonable to assume that customers and

---

[3] City's decision includes the following relevant condition:

"1. The applicant shall dedicate to the City as Greenway all portions of the site that fall within the existing 100-year floodplain [of Fanno Creek] (*i.e.*, all portions of the property below elevation 150.0) and all property 15 feet above (to the east of) the 150.0 foot floodplain boundary. The building shall be designed so as not to intrude into the greenway area."

The dedication required by that condition comprises about 7,000 square feet, or approximately 10 percent of the subject real property.

[4] The applicants requested variances to Community Development Code standards requiring among other things dedication of area of the subject parcel that is within the 100-year floodplain of Fanno Creek and dedication of additional area adjacent to the 100-year floodplain for a pedestrian/bicycle path.

employees of the future uses of this site could utilize a pedestrian/bicycle pathway adjacent to this development for their transportation and recreational needs. In fact, the site plan has provided for bicycle parking in a rack in front of the proposed building to provide for the needs of the facility's customers and employees. It is reasonable to expect that some of the users of the bicycle parking provided for by the site plan will use the pathway adjacent to Fanno Creek if it is constructed. In addition, the proposed expanded use of this site is anticipated to generate additional vehicular traffic, thereby increasing congestion on nearby collector and arterial streets. Creation of a convenient, safe pedestrian/bicycle pathway system as an alternative means of transportation could offset some of the traffic demand on these nearby streets and lessen the increase in traffic congestion.

"\* \* \* \* \*

"At this point, the report will consider the applicant's request from the requirement to dedicate portions of the site within the 100-year floodplain of Fanno Creek for storm water management purposes. The applicant's *Statement of Justification for Variance* \* \* \* does not directly address storm water draining concerns \* \* \*.

"The Commission does not find that the requirements for dedication of the area within the floodplain of Fanno Creek for storm water management and greenway purposes constitutes a taking of the applicant's property. Instead, the Commission finds that the required dedication would be reasonably related to the applicant's request to intensify the usage of this site, thereby increasing the site's impervious area. The increased impervious surface would be expected to increase the amount of storm water runoff from the site to Fanno Creek. The Fanno Creek drainage basin has experienced rapid urbanization over the past 30 years causing a significant increase in stream flows after periods of precipitation. The anticipated increased storm water flow from the subject property to an already strained creek and drainage basin can only add to the public need to manage the stream channel and floodplain for drainage purposes. Because the proposed development's storm drainage would add to the need for public management of the Fanno Creek floodplain, \* \* \* the requirement of dedication of the floodplain area on the site is related to the applicant's plan to intensify development on the site." City of Tigard Planning Commission Final Order No. 91-09 PC at 13, 20-21.

On petitioners' appeal, the Tigard City Council approved the Planning Commission's final order.

Petitioners appealed to LUBA. They did not challenge the adequacy of city's above quoted findings or their evidentiary support in the record. Rather, petitioners argued that city's dedication requirements are not related to their proposed development and, therefore, that those requirements constitute an uncompensated taking of their property under the Fifth Amendment.

In considering petitioners' federal taking claim, LUBA assumed that city's findings about the impacts of the proposed development were supported by substantial evidence. *Dolan v. City of Tigard*, 22 Or LUBA 617, 626 n 9 (1992). Accordingly, LUBA considered only whether those findings were sufficient to establish the requisite relationship between the impacts of the proposed development and the exactions imposed, *i.e.*, do city's findings support city's action? LUBA stated:

> "Petitioners do not contend that establishing a greenway in the floodplain of Fanno Creek for storm water management purposes, and providing a pedestrian/bicycle pathway system as an alternative means of transportation, are not legitimate public purposes. Further, petitioners do not challenge the sufficiency of the 'nexus' between these *legitimate public purposes* and the *condition* imposed requiring dedication of portions of petitioners' property for the greenway and pedestrian/bicycle pathway. Rather, petitioners' contention is that under both the federal and Oregon Constitutions, the relationship between the *impacts* of the proposed development and the *exactions* imposed are insufficient to justify requiring dedication of petitioners' property without compensation." *Id.* at 621 (emphasis in original).

LUBA concluded:

> "In view of the comprehensive Master Drainage Plan adopted by respondent providing for use of the Fanno Creek greenway in management of storm water runoff, and the undisputed fact that the proposed larger building and paved parking area on the subject property will increase the amount of impervious surfaces and, therefore, runoff into Fanno Creek, we conclude there is a 'reasonable relationship' between the proposed development and the requirement to dedicate land along Fanno Creek for a greenway.

"Furthermore, the city has adopted a Comprehensive Pedestrian/Bicycle Pathway Plan which provides for a continuous network of pedestrian/bicycle pathways as part of the city's plans for an adequate transportation system. The proposed pedestrian/bicycle pathway segment along the Fanno Creek greenway on the subject property is a link in that network. Petitioners propose to construct a significantly larger retail sales building and parking lot, which will accommodate larger numbers of customers and employees and their vehicles. There is a reasonable relationship between alleviating these impacts of the development and facilitating the provision of a pedestrian/bicycle pathway as an alternative means of transportation." *Id.* at 626-27.

LUBA held that the challenged conditions requiring dedication of portions of petitioners' property did not constitute an unconstitutional taking under the Fifth Amendment. *Id.* at 627.

The Court of Appeals affirmed, rejecting petitioners' contention that in *Nollan v. California Coastal Comm'n*, 483 US 825, 107 S Ct 3141, 97 L Ed 2d 677 (1987), the Supreme Court had abandoned the "reasonable relationship" test for a more stringent "essential nexus" test. *Dolan v. City of Tigard, supra*, 113 Or App at 166-67.[5]

On review,[6] petitioners first argue that city must meet a higher standard than a "reasonable relationship,"

---

[5] In *Nollan*, the California Coastal Commission conditioned a permit to the plaintiffs to replace a bungalow on their beachfront lot with a larger house on allowing a public easement to go across their beach, which was located between two public beaches. The California Court of Appeals had found that there was no taking, because the condition did not deprive the landowners of all reasonable use of their property. In an opinion written by Justice Scalia, the *Nollan* majority concluded that none of the designated purposes was substantially advanced by preserving a right to public access:

"It is quite impossible to understand how a requirement that people already on the public beaches be able to walk across the Nollans' property reduces any obstacles to view the beach created by the new house. It is also impossible to understand how it lowers any 'psychological barrier' to using the public beaches, or how it helps to remedy any additional congestion on them caused by construction of the Nollans' new house." *Nollan v. California Coastal Comm'n*, 483 US 825, 838-39, 107 S Ct 3141, 97 L Ed 2d 677 (1987).

[6] We review pursuant to ORS 197.850(9), which provides:

"The court may affirm, reverse or remand the order. The court shall reverse or remand the order only if it finds:

"(a) The order to be unlawful in substance or procedure, but error in procedure shall not be cause for reversal or remand unless the court shall find that substantial rights of the petitioner were prejudiced thereby;

that there must be an "essential nexus" or "substantial relationship" between the impacts of the development and the dedication requirements; otherwise, imposing exactions as a condition of land use approval is an unconstitutional taking. They rely on *Nollan v. California Coastal Comm'n, supra.*[7] Petitioners argue that, because city has not demonstrated an essential nexus between its exactions and the demands that petitioners' proposed use will impose on public services and facilities, the requisite substantial relationship is missing and, therefore, that the exactions imposed on them by city constitute a taking under the Fifth Amendment. As a fallback position, petitioners argue that city cannot demonstrate even a "reasonable relationship" between their development's impacts and city's exactions.[8]

---

"(b) The order to be unconstitutional; or

"(c) The order is not supported by substantial evidence in the whole record as to the facts found by the board under ORS 197.830(13)."

[7] In *Nollan*, the Supreme Court stated:

"Our cases have not elaborated on the standards for determining what constitutes a 'legitimate state interest' or what type of connection between the regulation and the state interest satisfies the requirement that the former 'substantially advance' the latter. They have made clear, however, that a broad range of governmental purposes and regulations satisfies these requirements." 483 US at 834-35 (footnote omitted).

The Supreme Court generally has eschewed any "set formula" for determining when and under what circumstances a given regulation would be seen as going "too far" for purposes of the Fifth Amendment, preferring to engage in essentially *ad hoc*, factual inquiries. *Lucas v. So. Carolina Coastal Council*, 505 US ___, 112 S Ct 2886, 120 L Ed 2d 798 (1992); *see McDougal v. County of Imperial*, 942 F2d 668, 677-78 (9th Cir 1991) (takings analysis involves essentially *ad hoc*, factual inquiries).

[8] Petitioners also argue that, because city's dedication conditions would require permanent physical occupation of a portion of their property, they amount to a *per se* taking. That argument is not well taken. Such dedication conditions are not *per se* takings, because the occupation may occur only with the owner's permission. Petitioners may avoid physical occupation of their land by withdrawing their application for a development permit.

The Supreme Court's analysis in *Yee v. City of Escondido*, 503 US ___, 112 S Ct 1522, 118 L Ed 2d 153 (1992), settles this point. In *Yee*, the owner of a mobile home park asserted a *per se* taking when the local city council adopted a rent control ordinance that, as the park owner argued, transferred a discrete interest in land from the park owner to his tenants. The *Yee* court held:

"The government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land. 'This element of required acquiescence is at the heart of the concept of occupation.' " 118 L Ed 2d at 165 (emphasis in original).

Because the park owner in *Yee* could have evicted the tenants and used the property

City responds that the "reasonable relationship" test which was widely applied in regulatory takings cases before the Supreme Court's decision in *Nollan* was not abandoned in *Nollan*. Under that test, city asserts, the dedication conditions that it imposed on petitioners do not constitute a taking under the Fifth Amendment.

■    A land-use regulation does not effect a "taking" of property, within the meaning of the Fifth Amendment prohibition against taking private property for public use without just compensation, if it substantially advances a legitimate state interest and does not deny an owner economically viable use of the owner's land. *Nollan v. California Coastal Comm'n, supra*, 483 US at 835-36; *Keystone Bituminous Coal Assn. v. DeBenedictis*, 480 US 470, 495, 107 S Ct 1232, 94 L Ed 2d 472 (1987); *Agins v. City of Tiburon*, 447 US 255, 260, 100 S Ct 2138, 65 L Ed 2d 106 (1980). Requiring an uncompensated conveyance of the easement outright would violate the Fourteenth Amendment. *Nollan, supra*, 483 US at 834.

Before the Supreme Court's decision in *Nollan*, federal and state courts struggled to identify the precise connection that must exist between the conditions incorporated into a regulation and the governmental interest that the regulation purports to further if the regulation is to be deemed to "substantially advance" that interest. In the midst of a range of tests set forth by various courts, the Ninth Circuit Court of Appeals concluded in *Parks v. Watson*, 716 F2d 646, 652 (9th Cir 1983), that, at the very least, a condition requiring an applicant for a governmental benefit to forego a constitutional right is unlawful if the condition is not rationally related to the benefit conferred. By way of example, the *Parks* court discussed "subdivision exaction" cases, where a city allows a developer to subdivide in exchange for a contribution. In such cases, the court noted, "there is agreement among the states 'that the dedication should have some reasonable relationship to the needs created by the subdivision.' " *Id.* at 653. Thus, under the *Parks* analysis, exactions and impacts must be "reasonably related." In *Parks*, the court held that the exactions had "no rational relationship to

---

for another purpose, any physical invasion that might occur would not be the result of forced acquiescence. *Ibid.*

any public purpose related to the [impacts of the development]'' and, therefore, that the exactions could not be required without just compensation. *Id.* at 653.

In *Nollan*, the Court did not purport to abandon the generally recognized ''reasonably related'' test and, in fact, noted that its approach was ''consistent with the approach taken by every other court that has considered the question, with the exception of the California state courts.'' 483 US at 839 (citing a long list of exaction cases, beginning with *Parks v. Watson, supra*). The *Nollan* court stated:

> ''We can accept, for purposes of discussion, the Commission's proposed test [the 'reasonably related test'] as to how close a 'fit' between the condition and the burden is required, because we find that this case does not meet even the most untailored standards.'' *Id.* at 838.

Thus, we are unable to agree with petitioners that the *Nollan* court abandoned the ''reasonably related'' test.[9] We recognize, however, that the *Nollan* court's application of that test does provide some guidance as to how closely ''related'' exactions must be to impacts. For example, the *Nollan* court stated that the evident constitutional propriety of an exaction disappears

> ''if the condition substituted for the prohibition utterly fails to further the end advanced as the justification for the prohibition. When that essential nexus is eliminated, the situation becomes the same as if California law forbade shouting fire in a crowded theater, but granted dispensations

---

[9] We are not alone in interpreting *Nollan* in this manner. In *Commercial Builders v. Sacramento*, 941 F2d 872 (9th Cir 1991), *cert den* 112 S Ct 1997 (1992), the Ninth Circuit also held that *Nollan* did not demand any different level of scrutiny than the one it used in *Parks v. Watson, supra*:

> ''As a threshold matter, we are not persuaded that *Nollan* materially changes the level of scrutiny we must apply to this Ordinance. The *Nollan* Court specifically stated that it did not have to decide 'how close a "fit" between the condition and the burden is required'* * *. It also noted that its holding was 'consistent with the approach taken by every other court [*sic*] has considered the question,' citing *Parks* as the lead case in its string cite. * * *

> ''We therefore agree that *Nollan* does not stand for the proposition that an exaction ordinance will be upheld only where it can be shown that the development is directly responsible for the social ill in question. Rather, *Nollan* holds that where there is no evidence of a nexus between the development and the problem that the exaction seeks to address, the exaction cannot be upheld.'' *Id.*, 941 F2d at 874-75.

to those willing to contribute $100 to the state treasury." *Id.* at 837.[10]

Petitioners read that passage as indicating that in *Nollan* the Supreme Court abandoned the "reasonably related" test for a more stringent "essential nexus" test.[11] We do not read *Nollan* that way.

■      The quoted passage indicates that, for an exaction to be considered "reasonably related" to an impact, it is essential to show a nexus between the two, in order for the regulation to substantially advance a legitimate state interest, as required by *Agins v. City of Tiburon, supra*, 447 US at 260. In *Nollan*, the Court stated that, "unless the permit condition serves the same governmental purpose as the development ban, the building restriction is not a valid regulation of land use but 'an out-and-out plan of extortion.' " *Nollan v. California Coastal Comm'n, supra*, 483 US at 837 (citations omitted). *Nollan*, then, tells us that an exaction is reasonably related to an impact if the exaction serves the same purpose that a denial of the permit would serve. *See Dept. of Trans. v. Lundberg*, 312 Or 568, 578, 825 P2d 641, *cert den* 113 S Ct 467 (1992) (sidewalk dedication requirement serves the same legitimate governmental purposes that would justify denying permits to develop commercially zoned properties).

■      In this case, we conclude that city's unchallenged factual findings support the dedication conditions imposed by

---

10 In *Nollan*, the Supreme Court said:

"We view the Fifth Amendment's Property Clause to be more than a pleading requirement, and compliance with it to be more than an exercise in cleverness and imagination. As indicated earlier, our cases describe the condition for abridgement of property rights through the police power as a '*substantial* advanc[ing]' of a legitimate state interest. We are inclined to be particularly careful about the adjective where the actual conveyance of property is made a condition to the lifting of a land-use restriction, since in that context there is heightened risk that the purpose is avoidance of the compensation requirement, rather than the stated police power objective." 483 US at 841.

*See Lucas v. So. Carolina Coastal Council, supra*, 120 L Ed 2d at 813 (the Fifth Amendment is violated when land use regulation does not substantially advance legitimate state interests or denies an owner all economically viable use of land).

11 The term "substantial relationship" is not used in *Nollan*, although the Court did cite *Agins v. City of Tiburon*, 447 US 255, 260, 100 S Ct 2138, 65 L Ed 2d 106 (1980), for the proposition that a regulation must "substantially advance legitimate state interests." *Nollan, supra*, 483 US at 834.

city. The pedestrian/bicycle pathway condition had an essential nexus to the anticipated development because, as the city found in part

> "the proposed expanded use of this site is anticipated to generate additional vehicular traffic, thereby increasing congestion on nearby collector and arterial streets. Creation of a convenient, safe pedestrian/bicycle pathway system as an alternative means of transportation could offset some of the traffic demand on these nearby streets and lessen the increase in traffic congestion." *Dolan v. City of Tigard, supra,* 22 Or LUBA at 622 (quoting City of Tigard Planning Commission Final Order at 20).

We are persuaded that the transportation needs of petitioners' employees and customers and the increased traffic congestion that will result from the development of petitioners' land do have an essential nexus to the development of the site, and that this condition, therefore, is reasonably related to the impact of the expansion of their business.

Because the development would involve covering a much larger portion of petitioners' land with buildings and parking, thus increasing the site's impervious area, the condition requiring petitioners to dedicate a portion of their property for improvement of a storm drainage system also is reasonably related to the impact of the expansion of their business. The increased impervious surface would be expected to increase the amount of storm water runoff from the site to Fanno Creek. We hold that there is an essential nexus between the increased storm water runoff caused by petitioners' development and the improvement of a drainage system to accommodate that runoff.

We agree with LUBA's conclusion that the challenged condition requiring dedication of portions of petitioners' property is not an unconstitutional taking of petitioners' property in violation of the Fifth Amendment.

The decision of the Court of Appeals and the order of the Land Use Board of Appeals are affirmed.

**PETERSON, J.,** dissenting.

Petitioners own a commercial building in the business district of Tigard. They sought permission to replace an existing building with a larger building. The City of Tigard

imposed two conditions to the granting of a building permit: one was that petitioners convey a 15-foot easement adjacent to the east bank of Fanno Creek for "storm water management and greenway purposes"; the other was that petitioners convey an 8-foot easement for a pedestrian/bicycle pathway. Petitioners appealed, asserting a violation of the Fifth Amendment to the Constitution of the United States.

The Fifth Amendment provides in part that "private property [shall not] be taken for public use, without just compensation." This case principally involves questions of federal law. The majority states the issue as follows:

> "The issue is whether city has demonstrated the required relationship between the conditions that it attached to its approval of petitioners' proposed land use and the expected impacts of that land use." 317 Or at 112.

Development exactions such as those involved in the present case are not unusual. Over the years, a body of law has developed that permits governments, acting under their police power, to accomplish some things that also could be accomplished under their eminent domain powers. Roberts, *Mining with Mr. Justice Holmes*, 39 Vand L Rev 287 (1986).[1] Local governments, in the exercise of their federal police power and without payment of compensation, have been authorized to require developers to grant easements, make payments, or give up rights as a condition to the development of their property.

The federal rule that applies to such exactions has two facets. First, the exaction must serve a legitimate state purpose. Second, the exaction must be reasonably necessary to address problems, conditions, or burdens created by the underlying change of use of the landowner's property. *Nollan v. California Coastal Comm'n*, 483 US 825, 107 S Ct 3141, 97 L Ed 2d 677 (1987). The second facet requires a showing that the development created a need for the exaction. If a recited need for an exaction is only an excuse for what actually is a taking, the exaction is invalid.

---

[1] A note in the Boston University Law Review contains an excellent historical overview of exactions. *See* Note, " 'Take' My Beach Please!": Nollan v. California Coastal Commission *and a Rational-Nexus Constitutional Analysis of Development Exactions*, 69 BUL Rev 823, 848-49 (1989).

As does the majority, I place the burden of proving these two elements on the government that exacts the conditions. In establishing that the need for the exactions arises from an increased intensity of use, the government must show more than a theoretical nexus. It must show that the granting of the permit probably will create specific problems, burdens, or conditions that theretofore did not exist, and that the exaction will serve to alleviate the specific problems, burdens, or conditions that probably will arise from the granting of the permit. More than general statements of concern about increased traffic or public safety are required to support, as permissible regulation, what otherwise would be a taking. The *Nollan* opinion states:

> "We view the Fifth Amendment's Property Clause to be more than a pleading requirement, and compliance with it to be more than an exercise in cleverness and imagination. As indicated earlier, our cases describe the condition for abridgement of property rights through the police power as a '*substantial* advanc[ing]' of a legitimate state interest. We are inclined to be particularly careful about the adjective where the actual conveyance of property is made a condition to the lifting of a land-use restriction, since in that context there is heightened risk that the purpose is avoidance of the compensation requirement, rather than the stated police power objective." 483 US at 841.

Here, Tigard had two possible ways to obtain the easements. The first, and less desirable from the city's view, was to condemn the easements. That would require payment of compensation under either the state or federal constitution.[2] A second possible way to obtain the easements is by making the granting of them a condition to the granting of a permit.

I am satisfied that the city has met the first test, that the exactions serve a legitimate state purpose. The pivotal issue is whether the second requirement — that the need for the exactions arises from increased intensity of use — has been established. For the answer to this question, the court

---

[2] Article I, section 18, of the Oregon Constitution, provides in part:

"Private property shall not be taken for public use * * * without just compensation * * *."

In this court, petitioners make no claim under the Oregon Constitution.

should look at the city's order to determine whether its findings of fact demonstrate a need for the exactions ordered by the city.[3]

The city's order makes repeated references to other city ordinances that contemplate the creation of a floodplain greenway and a pedestrian/bicycle pathway. The order suggests that such exactions were to be attached to *all* requests for improvements. For example:

"Code Section 18.86.040 contains interim standards which are to be addressed for new developments in the CBD-AA zone. These requirements are intended to provide for projected transportation and public facility needs of the area. *The City may attach conditions to any development within an action area* prior to adoption of the design plan to achieve the following objectives:

"* * * * *

"b. The development shall facilitate pedestrian/bicycle circulation if the site is located on a street with designed bike paths or adjacent to a designated greenway/open space/park. Specific items to be addressed are as follows:

"i. Provision of efficient, convenient and continuous pedestrian and bicycle transit circulation systems, linking developments by requiring dedication and construction of pedestrian and bike paths identified in the comprehensive plan. * * *

"* * * * *

"A bicycle/pedestrian path is called for in this general location in the City of Tigard's Parks Master Plans (Murase and Associates, 1988) and the Tigard Area Comprehensive Pedestrian/Bicycle Pathway Plan 1974). In addition, Community Development Code Section 18.120.180.A.8 requires that *where landfill and/or development is allowed within or adjacent to the 100-year floodplain, the City shall require the dedication of sufficient open land area for greenway adjoining and within the floodplain in accordance with the adopted pedestrian/bicycle plan*. The proposed development site includes land within the 100 year floodplain of Fanno Creek.

"* * * * *

---

[3] Petitioners do not contest the sufficiency of the evidence to support the findings of fact.

"It is imperative that a continuous pathway be developed in order for the paths to function as an efficient, convenient, and safe system. Omitting a planned for section of the pathway system, as the variance would result in if approved, would conflict with Plan purposes and result in an incomplete system that would not be efficient, convenient, or safe. The requested variance therefore would conflict with the City's adopted policy of providing a continuous pathway system intended to serve the general public good and therefore fails to satisfy the first variance approval criterion.

"* * * * *

"As noted above, approval of the variance request would have an adverse effect on the existing partially completed pathway system because a system cannot fully function with missing pieces. If this planned for section is omitted from the pathway system, the system in this area will be much less convenient and efficient. If the pedestrian and bicycle traffic is forced onto City streets at this point in the pathway system because of this missing section, pedestrian and bicycle safety will be lessened. * * *

"* * * * *

"Code Section 18.120.180.A.8 requires that *where landfill and/or development is allowed within or adjacent to the 100-year floodplain, the City shall require the dedication of sufficient open land area for greenway adjoining and within the floodplain in accordance with the adopted pedestrian/ bicycle plan.* * * *

"* * * * *

"* * * As already noted, the code at Section 18.120.080.A.8 and many other related sections (e.g., Section 18.84.040.A.7) require dedication of floodplain areas, not only for construction of pathways, but primarily to allow for public management of the storm water drainage system. * * *

"* * * *In order to accomplish these public improvements related to increasing the flow efficiency of Fanno Creek, dedication of the area of the subject site within the 100-year floodplain and also the adjacent five feet is imperative.* Not requiring dedication of this area as a condition of development approval, as the applicant's variance proposal requests, would clearly conflict with purposes and policies of the Comprehensive Plan, Community Development Code, and the City's *Master Drainage Plan.*" City of Tigard Planning Commission Final Order No. 91-09 PC, pp 9-22 (1991) (emphasis added).

The quoted sections show the resolve of the city to get the easements and the purpose for the easements. However, the quoted sections of the order in no way establish that the easements necessarily are needed because of increased intensity of use of petitioners' (or anyone else's) property. Unquestionably, omission of the easements from any of the planned floodwater or pathway developments would "result in an incomplete system." But that is beside the point. If all that need be shown is that easements are needed for a legitimate public purpose, the constitutional protection evaporates. The critical question before us is whether the order shows an increased intensity of such magnitude that it creates the need for the exaction of the easements.

The following findings specifically relate to increased intensity of use in connection with the pedestrian/bicycle pathway easement:

"[T]he Commission finds that the dedication and pathway construction are reasonably related to the applicant's request to intensify the development of this site with a general retail sales use, at first, and other uses to be added later. It is reasonable to assume that customers and employees of the future uses of this site could utilize a pedestrian/bicycle pathway adjacent to this development for their transportation and recreational needs. In fact, the site plan has provided for bicycle parking in a rack in front of the proposed building to provide for the needs of the facility's customers and employees. It is reasonable to expect that some of the users of the bicycle parking provided for by the site plan will use the pathway adjacent to Fanno Creek if it is constructed." *Id.* at 13.

Whether the first sentence of the quoted material is viewed as a legal conclusion or a finding of ultimate fact, it must be supported by findings of fact. Supporting findings are lacking. The sentence beginning with "It is reasonable to assume" is speculation, not a finding. Moreover, it states the obvious. If a pathway were built, of course customers and employees "could utilize [the pathway] for their transportation and recreational needs." Concerning the third sentence, the fact that the plans contain a reference to a bicycle rack does not establish increased intensity of use (particularly because other city ordinances require, as was required in this case, provision for bicycle parking in the plans).

The city did make some specific findings relevant to the pedestrian/bicycle pathway:

"In addition, the proposed expanded use of this site is anticipated to generate additional vehicular traffic thereby increasing congestion on nearby collector and arterial streets. Creation of a convenient, safe pedestrian/bicycle pathway system as an alternative means of transportation could offset some of the traffic demand on these nearby streets and lessen the increase in traffic congestion." *Ibid.*

The real issue is whether the findings that a larger building is being constructed and the two sentences of the quoted findings are sufficient to support the pathway exaction. I maintain that if the city is going to, in effect, take a portion of one's property incident to an application for a permit to develop the property, the findings of need arising from increased intensity of use must be more direct and more substantial than those. The findings of fact that the bicycle pathway system *"could* offset some of the traffic demand" is a far cry from a finding that the bicycle pathway system *will*, or is *likely to*, offset some of the traffic demand. (Emphasis added.) In essence, the only factual findings that support the pedestrian/bicycle pathway exaction are these: A larger commercial building is to be constructed and, as a result, there is anticipated to be "additional vehicular traffic." That is not enough to support what amounts to a virtual taking of petitioners' land. I would require findings that *demonstrate* that the increased intensity of use requires the exaction. These findings do not establish that the pathway exaction is needed because of any higher intensity of use.

I turn to the flood control and greenway easement. The factual conclusion asserted to support this exaction reads as follows:

"The increased impervious surface would be expected to increase the amount of storm water runoff from the site to Fanno Creek. The Fanno Creek drainage basin has experienced rapid urbanization over the past 30 years causing a significant increase in stream flows after periods of precipitation. The anticipated increased storm water flow from the subject property to an already strained creek and drainage basin can only add to the public need to manage the stream channel and floodplain for drainage purposes. Because the proposed development's storm drainage would add to the

need for public management of the Fanno Creek floodplain, the Commission finds that the requirement of dedication of the floodplain area on the site is related to the applicant's plan to intensify development on the site." *Id.* at 21.

Those findings do not establish such an increased intensity of use as to require the exaction of the flood control and greenway easement. All that these findings establish is that there will be some increase in the amount of storm water runoff from the site. A thimbleful? The constitution requires more than that.

Jurisprudence lags behind the times. It is its nature to react, rather than to act. Today, forces of change are at work that challenge traditional "takings" law, forces that jurisprudence has not yet had time to accommodate. Those forces coalesce into a single phenomenon: increasing interdependence among us. There are more of us, we live closer together, and we are increasingly interconnected. That phenomenon is not going to change except, perhaps, to accelerate.

With respect to "takings" jurisprudence, two essentially opposing tendencies emerge. The first is a tendency to recognize the legitimacy of attempts by state and local governments to regulate private property in ways that once might have been unthinkable. No person has the same range of possible uses for real property that he or she once may have had, because many uses that once were possible now may be forbidden because of their palpable impact on others. In truth, by regulation, governments regularly and permissibly take private property for public use without compensation.[4]

---

[4]

"For a long time, there has been no Just Compensation Clause in constitutional law. Three words, 'for public use,' have been cut away from it, treated as if they prescribed a distinct command of their own. Instead of the Just Compensation Clause as written, we have a *Takings Clause* engulfed in confusion and a *Public Use Clause* of nearly complete insignificance.

"This strange breach is never remarked on. It is simply presupposed, most clearly, by those who complain about the toothlessness of the 'Public Use Clause' in modern doctrine. Their complaint is an old story: it has to do with the line of Supreme Court decisions in which the public-purpose requirement received its current, broad construction." Rubenfeld, *Usings*, 102 Yale LJ 1077, 1078-79 (1993) (footnotes omitted; emphasis in original).

The second tendency — to some extent an outgrowth of the first — is that state and local governments attempt to further particular goals by placing limitations on uses of private property that only will be lifted if the property owners "dedicate" some portion of their property to the particular government program. The temptation, particularly in times of limited tax revenues, is to place the primary burden for funding projects on the shoulders of those whose private property happens to be in the neighborhood of the proposed projects, whether or not the projects bear any relationship to the property or to the uses to which the property is put.

The first of these tendencies seems benign and, even if it were otherwise, it would be inevitable. Some private property rights are going to have to bend, if our increasingly interdependent society is to continue to evolve and progress peacefully. The second tendency is an attempt at licensed extortion. The trouble is, what once would have been recognizable as extortion may turn, in time, into something considered benign because it is so familiar. That transmogrification is encouraged every time a court cannot distinguish whether a particular governmental regulation falls within the ambit of the second tendency, rather than the first.

In cases involving exactions attached to permits, hearings are held, evidence is taken, and findings are made, and the government must show why the development spawns the need for the exaction. The findings relating to the need for exactions arising from future increased intensity of use after the property is developed must establish more than a *potential* increase in intensity; they must establish more than *some* increase in intensity; they must establish a bona fide need for the extraction that arises from the development.

Because this case turns on federal law, the majority and I rely on the same federal precedents. Why, then, do we arrive at different results? Under current federal law, if a local government follows the procedures mandated by federal law, it can, incident to the regulation of use of land, take a large part of the owner's ownership rights, so long as there remains *some* economically feasible private use. *Lucas v. So. Carolina Coastal Council*, 505 US ___, 112 S Ct 2886, 120 L Ed 2d 798, 815 n 8 (1992). As the *Lucas* opinion itself states, landowners who lose 95 percent of the beneficial use of their

property are entitled to no compensation, whereas landowners who lose all beneficial use fully are compensated. *Ibid.*

That power of the government gives it tremendous leverage against landowners who seek to improve their property. Because of the profound potential adverse effects that the substantive rule places on landowners, I read the federal precedents to require a high threshold that the government must meet in showing that the exaction is needed because of intensified land use by the landowner. It is not enough for a government to read the latest pertinent decision of the Supreme Court of the United States and insert in its order "magic words" from the decision (such as "the dedication and pathway construction are reasonably related to the applicant's request to intensify the development of this site"). If in fact the government needs to take part of a landowner's property because of intensified uses of the developed property, imposing the burden of showing precisely *why* the need in fact exists is a modest burden to place on the government. Such precision is lacking in this order.

From reading the order in this case, I am convinced that Tigard decided that it needed a pedestrian/bicycle pathway and a flood control greenway easement along Fanno Creek. One way of getting these, free of cost, is by requiring all owners who propose to change the use of their property to convey the easements to the city. That is what happened in this case.

The findings here do not establish any cognizable remediable purpose attributable to the change in use. The conditions relating to the pedestrian/bicycle pathway and flood control and greenway easements are impermissible on the record made in this case. I therefore dissent.