On certified questions from United States Court of Appeals for the Ninth Circuit; certification order dated July 29, 2008; certification accepted December 10, 2008; argued and submitted September 17, 2009; certified questions answered September 23, 2010

WEST LINN CORPORATE PARK, L.L.C.,
*Plaintiff,*

*v.*

CITY OF WEST LINN,
Boris Piatski,
and John Does 1-10,
*Defendants.*

(USCA 05-53061)

WEST LINN CORPORATION PARK, L.L.C.,
*Plaintiff,*

*v.*

CITY OF WEST LINN,
Boris Piatski,
and John Does 1-10,
*Defendants.*

(USCA 05-36062; SC S056322)

240 P3d 29

D. Joe Willis, Schwabe, Williamson & Wyatt, P.C., Portland, argued the cause and filed the brief for plaintiff. With him on the brief were Michael T. Garone and Jill S. Gelineau.

Robert E. Franz, Jr., Springfield, argued the cause and filed the brief for defendants.

Alan M. Sorem and Hunter B. Emerick, Salem, filed a brief for *amicus curiae* National Association of Homebuilders.

John M. Groen, Bellevue, WA, and Meriem L. Hubbard, Sacramento, CA, filed a brief for *amicus curiae* Pacific Legal Foundation.

Edward J. Sullivan, Carrie A. Richter, and Harry Auerbach, Portland, filed a brief for *amici curiae* League of Oregon Cities, American Planning Association, and the Oregon Chapter of the American Planning Association.

Before De Muniz, Chief Justice, and Durham, Balmer, Walters, Kistler, and Linder, Justices.*

---

* Gillette, J., did not participate in the decision of this case.

WALTERS, J.

Kistler, J., filed an opinion concurring in part and dissenting in part in which Linder, J., joined.

## WALTERS, J.

In this case, we answer three questions certified to us by the United States Court of Appeals for the Ninth Circuit (Ninth Circuit). The questions arise from an action that West Linn Corporate Park (plaintiff) originally filed in state court against the City of West Linn (the city) alleging that the city effected a taking of plaintiff's property when the city required, as a condition of development of that property, that plaintiff construct off-site public improvements. In that action, plaintiff asserted two claims for inverse condemnation and sought payment of just compensation. The city answered, asserted a counterclaim, and sought invalidation of a city ordinance that vacated a street abutting plaintiff's property. The city then removed the case to federal court. Following a bench trial, the federal district court entered judgment in favor of the city on plaintiff's inverse condemnation claims and in favor of plaintiff on the city's road vacation counterclaim. The parties cross-appealed to the Ninth Circuit, which entered an order certifying the following questions to this court:

1. "[W]hether a plaintiff bringing an inverse condemnation action alleging that a condition of development amounts to an exaction or a physical taking is required to exhaust available local remedies as a prerequisite to bringing his claim in state court."

2. "[W]hether a condition of development that requires a plaintiff to construct off-site public improvements, as opposed to dedicating an interest in real property such as granting an easement to a municipal entity, can constitute an exaction or physical taking."

3. "[W]hether the vacation of a street approved by the City Council purporting to act pursuant to [ORS 271.110] is *ultra vires* where the petition does not comply with the landowner consent provisions of [ORS 271.080]."

*West Linn Corporate Park LLC v. City of West Linn*, 534 F3d 1091, 1093-94 (9th Cir 2008) (certification order).

To understand fully the basis for the Ninth Circuit's first two questions, it is necessary to explain in greater detail

the procedural history of this case and the inverse condemnation claims that plaintiff filed in state court.[1] In its first claim for relief, plaintiff alleged that, as a condition of development, the city "required [it] to construct and dedicate to the City numerous public improvements for street and water"; that the cost of those improvements was "well beyond what is roughly proportional to the impact of Plaintiff's development"; and that the city's action constituted a taking under Article I, section 18, of the Oregon Constitution.[2] As a result, plaintiff alleged, it was entitled to payment of just compensation equal to the cost of the improvements that it had constructed.[3]

In its second claim for relief, plaintiff incorporated the facts that it alleged in its first claim for relief—that the city had required it to construct off-site improvements at a cost not "roughly proportional" to the impact of plaintiff's development—but alleged that those facts constituted a taking under the Fifth Amendment to the United States Constitution.[4] Plaintiff alleged that, as a result, it was entitled to payment of just compensation under the Fifth Amendment. In addition, plaintiff alleged that the city had violated

---

[1] In addition to the claims for inverse condemnation at issue here, plaintiff asserted claims for unjust enrichment, breach of contract, First Amendment retaliation, violation of Equal Protection, and claims for inverse condemnation arising from the vacation of Greene Street. The Ninth Circuit does not pose questions to this court relating to those claims.

[2] Article I, section 18, provides, in part:

"Private property shall not be taken for public use, nor the particular services of any man be demanded, without just compensation; nor except in the case of the state, without such compensation first assessed and tendered[.]"

[3] In its complaint, plaintiff alleged that it was entitled to just compensation in the amount of $840,260. That amount reflects the total that plaintiff alleged that it spent in construction of off-site street and water improvements, and in System Development Charges (SDCs). The Ninth Circuit does not pose questions that require our consideration of the validity of the SDCs.

[4] The Fifth Amendment provides, in part:

"No person shall be * * * deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

The Just Compensation Clause of the Fifth Amendment has been incorporated into the Due Process Clause of the Fourteenth Amendment and is binding on the states. *Chicago, Burlington, &c. R'D. v. Chicago*, 166 US 226, 241, 17 S Ct 581, 41 L Ed 979 (1897).

its civil rights and was liable for attorney fees under 42 USC section 1983.[5]

Plaintiff's allegations that the city effected a taking of its property by imposing costs of construction not "roughly proportional" to the impact of plaintiff's development derive from two United States Supreme Court cases—*Nollan v. California Coastal Comm'n*, 483 US 825, 831-32, 107 S Ct 3141, 97 L Ed 2d 677 (1987), and *Dolan v. City of Tigard*, 512 US 374, 384, 114 S Ct 2309, 129 L Ed 2d 304 (1994). In *Nollan*, the California Coastal Commission required that, in exchange for a permit to demolish an existing bungalow and replace it with a three-bedroom house, the plaintiffs grant a public easement across their beachfront lot connecting two public beaches located on either side of the plaintiff's property. 483 US at 828. The commission asserted that requiring the easement was a valid exercise of its regulatory authority to protect and grant visual access to the ocean and that that access would be diminished by construction of the larger house. The Court recognized the commission's interest as legitimate but held that it did not justify requiring that the plaintiffs provide physical access across their property. The Court concluded that, by demanding the easement as a condition of development, the commission had converted "a valid regulation of land" into "an out-and-out plan of extortion," *id.* at 837 (internal quotation marks omitted), that effected a taking for which just compensation was required, *id.* at 842.

In *Dolan*, although the Court did not see the same "gimmicks" that it had noted in *Nollan*, it again concluded that the city had not established the necessary nexus between the conditions that it wished to impose and the effects of the proposed development. 512 US at 387, 394-96. The plaintiff had applied for a permit to double the size of her retail store and pave her gravel parking lot. The city had

---

[5] 42 USC section 1983 makes persons acting under the color of law liable for the violation of the federal constitution or laws. It provides, in part:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State * * * subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law * * *."

required her to dedicate a pedestrian/bicycle pathway and a public greenway along a creek to relieve anticipated increases in congestion and flooding. After concluding that the dedications and the projected impact of the development must be "roughly proportional" to one another and that the city's findings were inadequate to establish that that standard had been met, the Court concluded that the dedications were unconstitutional takings that could not be sustained. *Id.* at 394-96.

■ In this case, plaintiff alleged that the city's requirement that it construct off-site improvements at a cost not "roughly proportional" to the impacts of its development constituted a taking under the state and federal constitutions, entitling it to payment of just compensation. To obtain that compensation, plaintiff filed two claims for "inverse condemnation": the first asserting that the city had effected a taking under the state constitution; the second asserting that the city had effected a taking under the federal constitution. The term "inverse condemnation" encompasses both of plaintiff's claims. An "[i]nverse condemnation" claim is any claim "against a governmental agency to recover the value of property taken by the agency although no formal exercise of the power of eminent domain has been completed by the taking agency." *Boise Cascade Corp. v. Board of Forestry*, 325 Or 185, 187 n 1, 935 P2d 411 (1997) (internal quotation marks and citation omitted).

Plaintiff appropriately filed both of its claims for inverse condemnation in state court. *See id.* at 187-88 (inverse condemnation action alleging taking under state and federal constitutions in state court); *Coast Range Conifers v. Board of Forestry*, 339 Or 136, 151-55, 117 P3d 990 (2005) (inverse condemnation action alleging taking under federal constitution in state court); *see also San Remo Hotel, L.P. v. City & County of San Francisco*, 545 US 323, 347, 125 S Ct 2491, 162 L Ed 2d 315 (2005) (state courts fully competent to hear federal takings claims). Plaintiff also appropriately filed its section 1983 claim in state court. *See, e.g., Suess Builders v. City of Beaverton*, 294 Or 254, 264-65, 265 n 10, 656 P2d 306 (1982) (entertaining, and noting that state courts generally entertain, claims under section 1983).

If this case had remained in state court, the state trial court would have been required to decide whether plaintiff alleged facts sufficient to assert state claims for just compensation and, if so, whether plaintiff was entitled to compensation and in what amount. The state court's conclusion as to the viability of plaintiff's claims would have depended on that court's determination whether what plaintiff alleged—that plaintiff was required to construct off-site improvements at a cost that was not "roughly proportional" to the impact of plaintiff's development—could amount to a taking under the state constitution, as plaintiff alleged in its first claim for relief, or under the federal constitution, as plaintiff alleged in its second claim for relief. The state court also would have been required to determine whether state law required exhaustion of administrative remedies as a prerequisite to assertion of those claims. *See id.* at 261-62 (considering those issues).

When the city removed the case to federal court, the federal district court was also presented with those same issues.[6] In addition, however, the federal court was required to address a question particular to the federal forum. As the Ninth Circuit explains in its certification order, the federal district court was required to decide whether plaintiff's second claim for relief, based on the Fifth Amendment, was ripe for its consideration under the Supreme Court's decision in *Williamson Planning Comm'n v. Hamilton Bank*, 473 US 172, 105 S Ct 3108, 87 L Ed 2d 126 (1985). *Williamson* holds that a plaintiff's federal takings claims are not ripe for consideration by a federal court unless the plaintiff establishes

---

[6] The federal district court was permitted to decide plaintiff's first claim for relief under the doctrine of supplemental jurisdiction. *See* 28 USC § 1367 (with limited exceptions not relevant here, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution"); *Vaden v. Discover Bank*, 556 US 49, ___ n 18, 129 S Ct 1262, 1277 n 18, 173 L Ed 2d 206 (2009) (citing 28 USC section 1367 and noting that federal courts "routinely exercise supplemental jurisdiction" over state law claims); *see also Chicago v. International College of Surgeons*, 522 US 156, 165, 118 S Ct 523, 139 L Ed 2d 525 (1997) (federal supplemental jurisdiction applies with equal force in cases in which the action has been removed from state court to federal court as a "removed case is necessarily one of which the [federal] district courts have original jurisdiction" (internal citation and ellipsis omitted)).

that it first pursued available state court remedies to attempt to obtain payment of just compensation from the state.

The Ninth Circuit explains the Supreme Court's decision in *Williamson* as follows:

> "In *Williamson*, the Supreme Court held that a land owner's Fifth Amendment takings claim against a local government is not ripe until the claimant has availed himself of all the administrative remedies through which the government might reach a final decision regarding the regulations that effect the taking, and any state judicial remedies for determining or awarding just compensation. *See* [473 US at 186] * * * (holding that '[b]ecause respondent has not yet obtained a final decision regarding the application of the zoning ordinance and subdivision regulations to its property, nor utilized the procedures Tennessee provides for obtaining just compensation, respondent's claim is not ripe'). The first condition, which has come to be known as 'prong-one ripeness,' requires a claimant to utilize available administrative mechanisms, such as seeking variances from overly-restrictive or confiscatory zoning ordinances, so that a federal court can assess the scope of the regulatory taking. *Id.* at 190-91 * * *. The second condition ('prong-two ripeness') is based on the principle that '[t]he Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation.' *Id.* at 194 * * *. Consequently, 'if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the [federal] Just Compensation Clause until it has used the procedure and been denied just compensation.' *Id.* at 195[.]'"

*West Linn Corporate Park LLC v. City of West Linn*, 534 F3d at 1091, 1099-1100 (9th Cir 2008).[7]

The plaintiff in *Williamson* had filed an action in federal court alleging, under section 1983, that a local government had adopted land use regulations that denied it the economically viable use of its property and seeking damages

---

[7] In its certification order, the Ninth Circuit refers to the issue as one of jurisdiction. *West Linn*, 534 F3d at 1099. Since the entry of that order, however, the Ninth Circuit has stated that the issue of *Williamson* ripeness is prudential only. *Guggenhiem v. City of Goleta*, 582 F3d 996, 1008-09 (9th Cir 2009), relying on *Suitum v. Tahoe Regional Planning Agency*, 520 US 725, 733-34, 117 S Ct 1659, 137 L Ed 2d 980 (1997).

based on the government's failure to compensate plaintiff for that taking. The Supreme Court ruled that the plaintiff's claim was not yet ripe. Under prong one of its analysis, the Court ruled that the plaintiff had not obtained a final decision from the local government enabling the federal court to determine with certainty the permitted uses of the plaintiff's property.[8] Under prong two of its analysis, the Court ruled that the plaintiff had not obtained a decision from the state court denying it just compensation. Under state law, as it had been interpreted by the state court, a property owner that claimed that governmental regulation denied it all economically viable use of its property could obtain compensation by filing an inverse condemnation action in state court. The Supreme Court decided that, because the plaintiff had not demonstrated that that procedure was unavailable or inadequate, the plaintiff's federal claim was premature. The Court stated: "[I]if a state provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." *Williamson*, 473 US at 195.

In this case, the federal district court decided that plaintiff's second claim for relief was not ripe under prong two of *Williamson*. The district court ruled that, before plaintiff could file an inverse condemnation action in state court, it was required, by state law, to appeal the city's requirement that plaintiff construct off-site improvements to the city's land use hearings officer, the city council, and finally to the state Land Use Board of Appeals (LUBA). Plaintiff had failed to take those administrative steps and, consequently, had

---

[8] The Court distinguished between the need for finality, which the Court did require, and exhaustion of administrative remedies, which the Court did not require. The Court stated:

"While the policies underlying the two concepts often overlap, the finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate."

*Williamson*, 473 US at 193.

deprived the state court of the opportunity to award just compensation. As a result, the federal district court held that plaintiff's second claim for relief, seeking just compensation under the Fifth Amendment and damages under section 1983, was barred.[9] Exercising supplemental jurisdiction, the district court then turned to plaintiff's first claim for relief seeking just compensation under the Oregon Constitution and concluded that plaintiff's failure to pursue available administrative remedies also precluded that claim.

Plaintiff appealed to the Ninth Circuit. To decide whether the district court had erred, the Ninth Circuit was required, as the district court had been, to examine state law and determine whether plaintiff was required to utilize available state procedures before filing its claims for inverse condemnation. The Ninth Circuit concluded that state law is unsettled with respect to whether pursuit of administrative remedies is a prerequisite to an inverse condemnation action premised on a taking under *Dolan* and *Nollan*:

> "The Oregon Supreme Court has not had occasion to consider this specific question of exhaustion. Two decisions, however, one from the Oregon Court of Appeals, and another from the Land Use Board of Appeals, reach opposite conclusions, highlighting, we feel, the unsettled nature of this aspect of Oregon law. *Compare Nelson v. City of Lake Oswego*, [126 Or App 416, 869 P2d 350 (1994)], *with Reeves v. City of Tualatin*, [31 Or LUBA 11, 1996 WL 33118832 (1996)]."

*West Linn*, 534 F3d at 1100. Thus, the Ninth Circuit asks this court to answer that question of state law, namely, whether

---

[9] The district court's analysis is consistent with other federal decisions following *Williamson*. If state law provides a mechanism that a plaintiff must follow to obtain payment of just compensation, a plaintiff's failure to utilize that mechanism precludes federal claims based on the alleged taking. *See, e.g.*, *Carson Harbor Village, Ltd. v. City of Carson*, 353 F3d 824, 826 (9th Cir 2004), *cert den*, 543 US 874 (2004) (failure to pursue inverse condemnation claim in state court precluded plaintiff's section 1983 claim); *Hacienda Valley Mobile Estates v. City of Morgan Hill*, 353 F3d 651, 661 (9th Cir 2003), *cert dismissed*, 543 US 1041 (2004) (failure to pursue relief under state law claim, precluded federal court from considering federal takings claim); *Kottschade v. City of Rochester*, 319 F3d 1038, 1042 (8th Cir 2003), *cert den*, 540 US 825 (2003) (same); *Baumgardner v. Town of Ruston*, 712 F Supp 2d 1180, 1198-1200 (WD Wash 2010) (failure to bring administrative land use petition under state law barred federal takings claim).

"[plaintiff's] complaint filed in the Clackamas County Circuit Court [was] sufficient under Oregon law to seek a final determination of compensation[.]" *Id.*

The district court's ruling that plaintiff was required to pursue local remedies before filing its claims for inverse condemnation presumed the viability of those claims. If state law does not recognize those claims, then plaintiff's failure to take administrative steps preliminary to their assertion cannot serve as a basis for entry of judgment against plaintiff. The Ninth Circuit therefore also needed to decide a second issue that the state court would have confronted had the case remained within its jurisdiction: does Oregon law recognize claims for inverse condemnation based on allegations that a local government has required a property owner to construct off-site improvements as a condition of development? The Ninth Circuit again considered Oregon law in that regard to be unsettled. In its certification order, the Ninth Circuit states:

> "The Oregon Supreme Court similarly has not had occasion to consider whether conditions of development that require off-site public improvements, that is, a requirement that a landowner improve public property—outside of the proposed development site—in which the landowner has no property interest can amount to an exaction. One case from the Oregon Court of Appeals of which we are aware squarely answers that question in the affirmative. *See Clark v. City of Albany,* [137 Or App 293, 904 P2d 185 (1995)]. However, a recent Oregon Court of Appeals decision has cast doubt on the continuing validity of *Clark. See Dudek v. Umatilla County,* [187 Or App 504, 69 P3d 751 (2003)]."

*Id.* at 1102. As a result, the Ninth Circuit explains:

> "[I]t is unclear how Oregon law would classify the conditions placed on the development of the West Linn Corporate Park to improve public property off its site. On the one hand, if the Oregon Supreme Court holds that such conditions can amount to an exaction, then assuming there is no need for exhaustion, we may proceed to analyze the conditions under the *Dolan* framework. If, on the other hand, the Oregon Supreme Court concludes that off-site public improvements do not amount to exactions, then it is

unclear whether under Oregon law, there is any viable cause of action for inverse condemnation."

*Id.* at 1104.

With that background, we return to and repeat the Ninth Circuit's first two questions:

1. "[W]hether a plaintiff bringing an inverse condemnation action alleging that a condition of development amounts to an exaction or a physical taking is required to exhaust available local remedies as a prerequisite to bringing his claim in state court."

2. "[W]hether a condition of development that requires a plaintiff to construct off-site public improvements, as opposed to dedicating an interest in real property such as granting an easement to a municipal entity, can constitute an exaction or physical taking."

*Id.* at 1093. In those questions, the Ninth Circuit uses the word "exaction" to mean a governmental action equivalent to a physical taking that entitles a property owner to payment of just compensation.[10] To reflect that meaning and the allegations of plaintiff's complaint, we rephrase the Ninth Circuit's first two questions as follows:[11]

1. Whether a plaintiff bringing an inverse condemnation action alleging that a city imposed, as a condition of development, a requirement that plaintiff construct off-site

---

[10] The Ninth Circuit notes:

"The term 'physical taking,' or a physical intrusion to benefit the public that the government causes to be placed on private property, generally is synonymous with an 'exaction,' or a condition of development that local government places on a landowner to dedicate a real interest in the development property for public use. *See, e.g., Dolan.*"

*West Linn,* 534 F3d at 1100 n 4.

[11] *See Western Helicopter Services v. Rogerson Aircraft,* 311 Or 361, 370-71, 811 P2d 627 (1991) (recognizing this court's discretion to reframe and restate certified questions). Plaintiff and the *amici* that filed a brief in support of the city agree that the Ninth Circuit's questions are more easily analyzed if rephrased. Plaintiff urges us to rephrase the Ninth Circuit's second question as follows: "[W]hether the required condition is an exaction that is subject to the 'rough proportionality' requirements set forth by the United States Supreme Court in *Dolan.*" The *amici* ask us to restate the second question as follows: "Can a condition of development that requires a landowner to develop off-site public property in which the landowner has no property interest constitute an exaction for which a Fifth Amendment remedy is available?"

improvements at a cost not "roughly proportional" to the impacts of the development is required to pursue administrative remedies before filing that claim in state court.

2. Whether a property owner that alleges that a city has required it to construct off-site improvements at a cost that is not "roughly proportional" to the impacts of the development, as opposed to dedicating an interest in real property such as granting an easement, alleges a taking that gives rise to a claim for just compensation.

We proceed to the first question.

## I. WAS PLAINTIFF REQUIRED TO PURSUE ADMINISTRATIVE REMEDIES?

As noted, the Ninth Circuit views Oregon law regarding the pursuit of administrative remedies to be unsettled based on a conflict that it perceives between the decision of the Court of Appeals in *Nelson v. City of Lake Oswego*, 126 Or App 416, 869 P2d 350 (1994), and the decision of LUBA in *Reeves v. City of Tualatin*, 31 Or LUBA 11 (1996). In *Nelson*, the plaintiffs alleged that the city had effected a taking of their property under the state and federal constitutions when the city manager required, as a condition of development, that the plaintiffs dedicate a 55-foot easement to the city. The plaintiffs filed judicial claims for inverse condemnation without first appealing the city manager's decision to the city council. The court recognized that plaintiffs who base inverse condemnation claims on use restrictions—claims that the court described as "regulatory takings" claims—must exhaust administrative remedies for two reasons:

> "First, the fact that one use is impermissible under the regulations does not necessarily mean that other economically productive uses are also precluded; and second, until alternative uses are applied for or alternative means of obtaining permission for the first use are attempted, there can be no conclusive authoritative determination of what is legally permitted by the regulations. Therefore, the courts cannot perform their adjudicative function on a claim predicated on a single denial, because something more must be decided by the local or other regulatory authority before there *can* be a demonstrable loss of all use and, therefore, a taking.

> *See Suess Builders v. City of Beaverton*, [294 Or 254, 261-62,
> 656 P2d 306 (1982)]."

126 Or App at 422 (emphasis in original).

However, the court distinguished a local govern-
ment's requirement that a property owner dedicate real prop-
erty from such regulatory takings and decided that exhaus-
tion of administrative remedies was not required under the
circumstances presented in *Nelson*, because

> "the condition has been imposed and the easement has been
> acquired by the city. There is nothing left to happen at the
> local or administrative level in order for the claim to be sus-
> ceptible to adjudication; the only question is whether what
> *has* occurred *is* a taking under the legal test that the condi-
> tion must bear a reasonable relationship to the impacts of
> the use to which the city has attached it. *Dolan v. City
> of Tigard*, 317 Or 110, 854 P2d 437, *cert granted* 510 US
> 989[, 114 S Ct 544, 126 L Ed 2d 446] (1993). The facts on
> both sides of the equation are readily susceptible to conven-
> tional judicial proof, and the adjudication of the facts and of
> the applicable law is well within the judicial competence."

*Id.* (emphasis in original).

*Reeves* was a LUBA decision that purported to apply
the court's decision in *Nelson*. The petitioner in *Reeves*, like
the plaintiffs in *Nelson*, objected to a required dedication of
real property. LUBA ruled that the petitioner was required
to seek a variance from the city before appealing that
requirement to LUBA. LUBA noted that that option had not
been available to the plaintiffs in *Nelson*. *Reeves*, 31 Or
LUBA at 17. Further, in *Nelson*, the city had acquired the
easement at issue, and there was "nothing left to happen at
the local level in order for a claim to be susceptible for adju-
dication." *Reeves*, 31 Or LUBA at 17 (citing *Nelson*, 126 Or
App at 422) (internal quotation marks omitted). In *Reeves*,
the city had not yet acquired the easement, and there were
other actions that the city could take that could affect
LUBA's decision. *Id.* LUBA explained that, until it could

> "ascertain how and to what extent the conditions will be
> imposed on the petitioner's property, [it would] have no way
> of determining whether the conditions bear an 'essential
> nexus' to the impacts of the development and whether any

exactions are roughly proportional to the impacts of petitioner's proposed development."

*Id.*

In addressing the Ninth Circuit's first question, plaintiff argues that *Nelson* is controlling Oregon law and stands for the proposition that exhaustion is not required when a plaintiff brings an inverse condemnation action based on a taking under *Nollan* and *Dolan.* We disagree. Although we do not apprehend the conflict that the Ninth Circuit sees as rendering Oregon law unsettled, we also do not see *Nelson* as determinative of the question that the Ninth Circuit poses. In this case, the city did not require plaintiff to dedicate real property as a condition of its development. Because the circumstances extant here may argue for exhaustion for the reasons that LUBA stated in *Reeves* and that the Court of Appeals did not have the opportunity to fully explore in *Nelson,* we take up the merits of the first question that the Ninth Circuit poses. We begin with a review of relevant precedent.

In *Fifth Avenue Corp. v. Washington County,* 282 Or 591, 622 n 23, 581 P2d 50 (1978), this court determined that a plaintiff that sought a declaratory judgment that a comprehensive plan was unconstitutional on the basis that it was arbitrary, capricious, and unreasonable as applied was required to exhaust administrative remedies before asserting that claim in court.[12] The comprehensive plan prohibited the plaintiff from building a district shopping center on its property, but local procedure entitled the plaintiff to seek a zone change or a plan amendment, which, if obtained, would have permitted that development. The court treated the issue as one of exhaustion of administrative remedies and observed that one of the purposes of that doctrine is to permit an administrative body with expertise "to determine[,] at least initially, factual and policy questions with which it is familiar, and, if litigation does result, to provide the reviewing court with a complete and well[-]organized record upon which it may base its judgment." *Id.* at 623 n 23. The court

---

[12] The plaintiff also brought a claim for inverse condemnation, but the court held that that claim was not cognizable. *Id.* at 609-14.

relied on the local planning body's expertise and the principle that "[o]rdinarily those who seek judicial relief must show they have exhausted their administrative remedies" in holding that the plaintiff's failure to exhaust administrative remedies barred his claim. *Id.* at 614 (internal quotation marks omitted).

The court extended the exhaustion requirement of *Fifth Avenue* to a plaintiff's claim for inverse condemnation in *Suess Builders*. In that case, the plaintiff alleged that the city had designated its property for future public acquisition and that that designation constituted a taking for which just compensation was required. The court decided that the plaintiff could not rest its claim on the plan designation, but had to demonstrate that it had sought relief, including pursuing administrative procedures for amending the plan. The court stated that, "if a means of relief from the alleged confiscatory restraint remains available, the property has not been taken." 294 Or at 262.

■ In *Boise Cascade*, the court declined, however, to require appeal to LUBA as a prerequisite to an inverse condemnation action. 325 Or 185, 935 P2d 411 (1997). Although LUBA has jurisdiction to decide whether governmental action constitutes a compensable taking, *Dunn v. City of Redmond*, 303 Or 201, 207, 735 P2d 609 (1987), the court in *Boise Cascade* refused to stay the plaintiff's inverse condemnation action until LUBA had an opportunity to rule, reasoning that the issue presented—whether a taking had occurred—was a constitutional question that fell within an area traditionally adjudicated by courts. *Boise Cascade*, 325 Or at 196.

*Fifth Avenue* and *Suess Builders* impose a requirement that a property owner obtain a clear and final ruling from the local government as to the permitted uses of its property before filing judicial action to challenge limitations on the use of that property. That rule can be viewed as ensuring that the decision of the local government is in truth its final decision or as a general requirement of efficiency in judicial administration. Through either lens, that requirement permits the local government to fully determine and review factual questions about the effect that its regulations have on

a particular property and policy questions about whether, given the specific circumstances presented, the government wishes to enforce those regulations. And through either lens, that requirement is of great benefit in avoiding unnecessary litigation or better informing a court should litigation ensue.

With regard to whether Oregon law imposes a requirement of finality or exhaustion before permitting the filing of an action for inverse condemnation, we do not see a significant difference between takings claims that are based on regulations that limit the use of property and those that are based on regulations that place conditions on its development. In either instance, a property owner that asserts objections to the regulations at the local level may obtain relief from regulatory restraint. In either instance, a requirement that a property owner take administrative steps prior to bringing judicial action permits the local government to determine the necessary effects of the regulations and whether, knowing those effects, it wishes to impose or enforce them. Just as a court benefits by requiring that local governments have the opportunity to assess fully the effects that use limitations have on property owners, so too does a court benefit from requiring that local governments have the opportunity to consider fully whether the conditions on development that it seeks to require are proportional to the impacts of development and whether to insist on imposing those conditions, given the assessment that it makes.

That conclusion does not mean, however, that a landowner must appeal the decision of the local government to LUBA before filing an action for inverse condemnation. LUBA reviews the decisions of local government, but it does not decide facts and cannot make policy decisions for local governments. *See* ORS 197.829(1)(c) (LUBA shall affirm local government's interpretation of a regulation unless that interpretation is inconsistent with underlying policy of comprehensive plan or land use regulation); ORS 197.835(2)(b) (LUBA bound by any findings of fact of the local government for which there is substantial evidence in the record); ORS 197.835(7)(a), (b) (LUBA shall reverse land use regulation if not in compliance with local government's comprehensive plan or the comprehensive plan lacks specific policies which provide the basis for the regulation). Requiring appeal to

LUBA would not serve the same purposes as does requiring the pursuit of local government remedies.[13]

Accordingly, we answer the Ninth Circuit's first question as follows: Assuming that Oregon law permits an inverse condemnation action premised on allegations that a condition of development requires a landowner to construct off-site improvements at a cost not roughly proportional to the impacts of development, Oregon law requires the landowner to pursue available local administrative remedies, but not to appeal to LUBA, as a prerequisite to bringing that action in state court.[14]

In this case, it is undisputed that plaintiff did not use available local procedures to seek to modify or annul the

---

[13] In reaching that conclusion, we do not consider the impact of ORS 197.796, which was not in effect at the time that the city imposed the conditions at issue in this case. That statute requires exhaustion before bringing state court claims for damages and provides, in part:

"(1) An applicant for a land use decision * * * may accept a condition of approval imposed * * * and file a challenge to the condition[.]

"* * * * *

"(3)(a) A challenge filed pursuant to this section may not be dismissed on the basis that the applicant did not request a variance to the condition of approval or any other available form of reconsideration of the challenged condition. However, an applicant shall comply with ORS 197.763(1) prior to appealing to the Land Use Board of Appeals or bringing an action for damages in circuit court and must exhaust all local appeals provided in the local comprehensive plan and land use regulations before proceeding under this section.

"(b) In addition to [other requirements,] * * * a statement shall be made to the applicant that the failure of the applicant to raise constitutional or other issues relating to proposed conditions of approval with sufficient specificity to allow the local government or its designee to respond to the issue precludes an action for damages in circuit court.

"* * * * *

"(6) This section applies to appeals by the applicant of a condition of approval and claims filed in state court seeking damages for the unlawful imposition of conditions of approval in a land use decision, limited land use decision, expedited land division or permit under ORS 215.427 or 227.178."

[14] Our decision that pursuit of available local remedies is a prerequisite to an action for inverse condemnation is not inconsistent with *Patsy v. Florida Board of Regents*, 457 US 496, 102 S Ct 2557, 73 L Ed 2d 172 (1982), which holds that exhaustion is not a prerequisite to assertion of a claim under section 1983. A section 1983 claim does not ripen until a landowner's inverse condemnation claim for compensation has been denied. *Suess Builders*, 294 Or at 267. We do not mean to suggest that, if a section 1983 claim is ripe, a landowner must take additional administrative steps before filing a claim under 42 USC section 1983.

requirement that it construct off-site improvements. *West Linn*, 534 F3d at 1102. Therefore, assuming that plaintiff had viable claims for inverse condemnation against the city, it did not pursue available local administrative remedies before bringing those judicial claims.

## II. DID PLAINTIFF ALLEGE FACTS GIVING RISE TO A CLAIM FOR JUST COMPENSATION?

The Ninth Circuit's second question, as we have restated it, is:

> Whether a property owner that alleges that a city has required it to construct off-site improvements at a cost that is not "roughly proportional" to the impacts of the plaintiff's development, as opposed to dedicating an interest in real property such as granting an easement, alleges a taking that gives rise to a claim for just compensation.

In its second question, the Ninth Circuit asks that we decide the question assumed in responding to its first question— were plaintiff's claims for just compensation as alleged in its first or second claims for relief viable in state court?

We begin with plaintiff's second claim for relief alleging that the city effected a taking under the Fifth Amendment. We realize that beginning with the federal constitution is contrary to our normal practice. *See, e.g., Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981) (proper sequence is to analyze state law, including constitutional law, before reaching federal constitutional claim). Nevertheless, we do so here because we must determine the viability of both of plaintiff's claims for just compensation to answer the Ninth Circuit's questions, and because plaintiff uses United States Supreme Court cases—*Nollan* and *Dolan*—as the theoretical basis for each of those claims. An initial discussion of Fifth Amendment jurisprudence therefore provides a helpful backdrop for our analysis.

A. *Did Plaintiff Allege Facts Giving Rise to a Claim for Just Compensation Under the Federal Constitution?*

After *Nollan* and *Dolan*, the Supreme Court decided a case that clarified the constitutional basis of those decisions—*Lingle v. Chevron USA Inc.*, 544 US 528, 548, 125

S Ct 2074, 161 L Ed 2d 876 (2005). In *Lingle*, the Supreme Court began by observing that governmental action that falls into one of the following categories constitutes a taking:

 1. A physical invasion of property, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 US 419, 102 S Ct 3164, 73 L Ed 2d 868 (1982);

 2. A regulation that completely deprives a plaintiff of all economically beneficial use of property, *Lucas v. South Carolina Coastal Council*, 505 US 1003, 112 S Ct 2886, 120 L Ed 2d 798 (1992); or

 3. A regulation that, on balance, imposes economic impacts that constitute a taking under the several factors identified in *Penn Central Transp. Co. v. New York City*, 438 US 104, 98 S Ct 2646, 57 L Ed 2d 631 (1978).[15]

The Court explained that those categories are intended to describe governmental actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his or her domain. Accordingly, each category describes governmental acts that impose burdens on private property rights. The Court stated:

 "A permanent physical invasion, however minimal the economic cost it entails, eviscerates the owner's right to exclude others from entering and using her property— perhaps the most fundamental of all property interests. *See Dolan*[, 512 US at 384]; *Nollan*[, 483 US at 831-32]; *Loretto*[, 458 US at 433]; *Kaiser Aetna v. United States*, 444 US 164, 176, 100 S Ct 383, 62 L Ed 2d 332 (1979). * * *

 "[T]he complete elimination of a property's value is the determinative factor. *See Lucas*[, 505 US at 1017] (positing that 'total deprivation of beneficial use is, from the

---

[15] *Penn Central* involved the question of whether the designation of New York City's Grand Central Terminal as a historical landmark, and the restrictions on development that that designation imposed, so adversely affected the plaintiffs' economic interests in the property as to constitute a taking requiring just compensation under the Fifth and Fourteenth Amendments to the United States Constitution. 438 US at 107. In deciding that the regulation at issue did not amount to a taking, the Court held that no set formula exists to determine when a regulation will constitute a taking, but it articulated "several factors that have particular significance" in the analysis, primary among which was "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations[.]" *Id.* at 124.

landowner's point of view, the equivalent of a physical appropriation'). * * *

"[T]he *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests."

*Lingle*, 544 US at 539-40 (paragraph structure added for clarity).

In *Lingle*, the Court then declared that other governmental acts that do not impose similarly severe burdens are not subject to challenge under the Takings Clause, but are, instead, subject to challenge under the Due Process Clause. Thus, the Court explained, a property owner's claim under *Agins v. City of Tiburon*, 447 US 255, 260, 100 S Ct 2138, 65 L Ed 2d 106 (1980), that a governmental regulation is invalid because it does not "substantially advance legitimate state interests" is properly viewed as a claim that due process precludes the regulation entirely, and not as a claim that the takings clause requires payment of just compensation. The Court stated:

"Instead of addressing a challenged regulation's effect on private property, the 'substantially advances' inquiry probes the regulation's underlying validity. But such an inquiry is logically prior to and distinct from the question whether a regulation effects a taking, for the Takings Clause presupposes that the government has acted in pursuit of a valid public purpose. The Clause expressly requires compensation where government takes private property *'for public use.'* It does not bar government from interfering with property rights, but rather requires compensation in the event of *otherwise proper interference* amounting to a taking. * * * Conversely, if a government action is found to be impermissible—for instance because it fails to meet the 'public use' requirement or is so arbitrary as to violate due process—that is the end of the inquiry. No amount of compensation can authorize such action."

*Lingle*, 544 US at 543 (emphases in original; internal citation and quotation marks omitted).

Although not necessary to its holding, the Court also addressed how its prior decisions in *Nollan* and *Dolan* fit into

that paradigm. The claims of the property owners in those cases could have been seen as implicating the Due Process Clause, because they challenged the sufficiency of the nexus between the state interest and the condition imposed and sought judicial invalidation of the condition. However, the claims in those cases also could have been seen as implicating the Takings Clause, because the conditions that the governments imposed required the property owners to dedicate real property for governmental use—the classic taking in which the government directly appropriates private property. The Court chose neither and placed *Nollan/Dolan* challenges into their own category—a "special application of the 'doctrine of unconstitutional conditions' ":

> "Although *Nollan* and *Dolan* quoted *Agins'* language, *see Dolan,* [512 US at 385]; *Nollan,* [483 US at 834], the rule those decisions established is entirely distinct from the 'substantially advances' test we address today. Whereas the 'substantially advances' inquiry before us now is unconcerned with the degree or type of burden a regulation places upon property, *Nollan and Dolan both involved dedications of property so onerous that, outside the exactions context, they would be deemed per se physical takings.* In neither case did the Court question whether the exaction would substantially advance some legitimate state interest. *See Dolan,* [512 US at 387-88]; *Nollan,* [483 US at 841]. Rather, the issue was whether the exactions substantially advanced the same interests that land-use authorities asserted would allow them to deny the permit altogether. As the Court explained in *Dolan,* these cases involve *a special application of the 'doctrine of "unconstitutional conditions," '* which provides that 'the government may not require a person to give up a constitutional right— here the right to receive just compensation when property is taken for a public use—in exchange for a discretionary benefit conferred by the government where the benefit has little or no relationship to the property.' [512 US at 385]. That is worlds apart from a rule that says a regulation affecting property constitutes a taking on its face solely because it does not substantially advance a legitimate government interest. In short, *Nollan* and *Dolan* cannot be characterized as applying the 'substantially advances' test we address today, and our decision should not be read to disturb these precedents."

*Id.* at 547-48 (emphases added; original emphases deleted).

Thus, under *Lingle*, in circumstances in which the government exacts "dedications of property so onerous that, outside the exactions context, they would be deemed *per se* physical takings," the Supreme Court subjects the government's exaction to a *Nollan/Dolan* analysis. *Id*. at 547. Under that analysis, the government is precluded from making the exaction and must pay just compensation for the real property that it acquires unless the exaction is "roughly proportional" to the effect of the proposed development.

The Ninth Circuit's second question requires that we consider the reasoning of the Supreme Court in *Nollan*, *Dolan*, and *Lingle* and decide whether the *Nollan/Dolan* analysis extends to a requirement that a property owner construct off-site improvements at a cost that is not "roughly proportional" to the impacts of the owner's development. In *Lingle* terms, we must decide whether such a requirement is "so onerous that, outside the exactions context, [it] would be deemed [a] *per se* physical taking." 544 US at 547.

Plaintiff first posits that the Oregon Court of Appeals already has recognized such a requirement as a Fifth Amendment taking and that this court should not disturb that ruling in answering a certified question. The case that plaintiff deems determinative is *Clark v. City of Albany*, 137 Or App 293, 299, 904 P2d 185 (1995), *rev den*, 322 Or 644, 912 P2d 375 (1996). In *Clark*, the Court of Appeals considered a ruling by LUBA that, as relevant here, applied *Dolan*'s "rough proportionality" standard to development conditions that required the petitioner "to make road improvements on and extending beyond the affected property." The Court of Appeals affirmed the application of that standard, seeing "little difference between a requirement that a developer convey title to the part of the property that is to serve a public purpose, and a requirement that the developer himself make improvements on the affected and nearby property and make it available for the same purpose." *Id*. at 300.

Although we agree with plaintiff's assertion that "[c]ertification is not an appropriate vehicle to obtain clarification of existing law or to test the continued viability of longstanding legal precedent against current conditions," *see Western Helicopter Services v. Rogerson Aircraft*, 311 Or 361,

374, 811 P2d 627 (1991), we do not think that those principles describe the posture of this case. *Clark* was decided in 1995, and, although *Nollan* and *Dolan* both had been decided, the Supreme Court had not had occasion to opine on their reach. In 1999, the Supreme Court decided *Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 US 687, 702, 119 S Ct 1624, 143 L Ed 2d 882 (1999), and stated that it had not extended the application of *Nollan* and *Dolan* "beyond the special context of [such] exactions." As a result of that statement, the Court of Appeals considered its decision in *Clark* "open to question." *Dudek v. Umatilla County*, 187 Or App 504, 516 n 10, 69 P3d 751 (2003). Then, in 2005, the Supreme Court decided *Lingle* and discussed, in the context of its disaggregation of due process and takings challenges, the jurisprudential underpinnings of *Nollan* and *Dolan*. We choose not to rest on a Court of Appeals case that predated *Lingle*.

On the merits, plaintiff contends that the city's requirement that it use "asphalt, concrete, bedding material, pipe and other personal property" to construct public improvements cannot be distinguished from the requirements imposed by the governments and considered by the courts in *Nollan* and *Dolan*. Plaintiff argues that any coerced transfer of property, whether real or personal, must meet the *Nollan/Dolan* standard. The city disagrees and urges that *Nollan* and *Dolan* are limited to required dedications of real property and do not extend to the imposition of an obligation to construct off-site improvements. Such an obligation, the city contends, is, functionally, a monetary obligation that the city has authority to impose to offset the impacts of plaintiff's development. Plaintiff responds that, even if that condition appropriately is characterized as a monetary exaction, the *Nollan/Dolan* analysis applies when government uses its regulatory power in an adjudicative proceeding to coerce such payment.

The Ninth Circuit considered a similar question in *McClung v. City of Sumner*, 548 F3d 1219 (9th Cir 2008), *cert den*, 129 S Ct 2765 (2009). The issue in that case was whether a city ordinance that required property owners, as a condition of development, to install storm pipes effected a taking. The Ninth Circuit viewed the ordinance as imposing a monetary obligation and decided that the validity of the

condition that it imposed should be subjected to a *Penn Central*, and not a *Nollan/Dolan*, analysis. The Ninth Circuit based its decision on the fact that the condition was legislatively imposed and applied to all development; it was not, as were the conditions in *Nollan* and *Dolan*, a condition imposed in an adjudicatory proceeding on the plaintiff alone.

The Ninth Circuit also stated, as an alternative basis for its ruling, that the property owners had not been required to relinquish an interest in real property:

> "[T]he City already had an easement for the storm pipe such that the McClungs gave up no rights to their real property. To extend the *Nollan/Dolan* analysis here would subject *any* regulation governing development to higher scrutiny and raise the concern of judicial interference with the exercise of local government police powers. As noted by *San Remo Hotel* [*L.P. v. City And County of San Francisco,* 117 Cal Rptr 2d 269, 291, 41 P3d 87, 105 (Cal 2002)], any concerns of improper legislative development fees are better kept in check by 'ordinary restraints of the democratic political process.' "

*McClung*, 548 F3d at 1227-28 (emphasis in original). The Ninth Circuit rejected the plaintiffs' argument that the city had effected a *per se* taking of its money and the plaintiff's citation to *Brown v. Legal Foundation of Washington*, 538 US 216, 123 S Ct 1406, 155 L Ed 2d 376 (2003). In *Brown*, the Supreme Court held that interest that accrued on lawyers' trust accounts (IOLTA accounts) was private property that the state could not acquire without payment of just compensation, but that the plaintiff in that case had suffered no loss for which compensation was due. In *McClung*, the Ninth Circuit distinguished the imposition of a new monetary obligation from the acquisition of accrued interest on an existing account and noted that *Brown* did not treat the acquisition of accrued interest as an exaction or apply the *Nollan/Dolan* analysis to the facts presented.[16] *McClung*, 548 F3d at 1228.

---

[16] The Ninth Circuit also stated:

"A monetary exaction differs from a land exaction—'[u]nlike real or personal property, money is fungible.' *United States v. Sperry Corp.*, [493 US 52, 62 n 9, 110 S Ct 387, 107 L Ed 2d 290 (1989)]; *see also San Remo Hotel, L.P. v. S.F. City & County,* [364 F3d 1088, 1097-98 (9th Cir 2004), *aff'd,* 545 US 323, 125 S Ct 2491, 162 L Ed 2d 315 (2005)] (stating that the state court's analysis of the state issues 'was thus equivalent to the approach taken in this circuit, which

In reaching its conclusion in *McClung*, the Ninth Circuit observed, however, that "[o]ther courts addressing this general issue have come to different conclusions."[17] Plaintiff asks that we adopt the reasoning of one of those courts—that of the Texas Supreme Court in *Town of Flower Mound v. Stafford Estates*, 135 SW 3d 620 (Tex 2004). In that case, the town had conditioned its approval of the plaintiff's development on its rebuilding of an abutting road. The Texas court saw "no important distinction between a dedication of property to the public and a requirement that property already owned by the public be improved" and held that the *Dolan* standard should apply to both. *Id.* at 640. The court dismissed the town's contention that the doctrine of unconstitutional takings was not applicable "when the thing given up in exchange for a discretionary benefit is simply money,

---

has also rejected the applicability of *Nollan/Dolan* to monetary exactions such as the ones at issue here'); *Garneau v. City of Seattle*, [147 F3d 802, 808 (9th Cir 1998)] (upholding a city ordinance that required landlords to pay a $1,000 per tenant relocation assistance fee to low income tenants displaced by the change of use or substantial rehabilitation of a property); *Commercial Builders of N. Cal. v. Sacramento*, [941 F2d 872, 873-75 (9th Cir 1991)] (rejecting application of *Nollan* to ordinance that conditioned the issuance of nonresidential building permits on the payment of a fee used to assist in financing low-income housing)."

*McClung*, 548 F3d at 1228.

[17] The Ninth Circuit summarized those differing conclusions as follows:

"*Compare Clajon Prod. Corp. v. Petera*, [70 F3d 1566, 1579 (10th Cir 1995)] (finding that '[g]iven the important distinctions between general police power regulations and development exactions, and the resemblance of development exactions to physical takings cases, we believe that the "essential nexus" and "rough proportionality" tests are properly limited to the context of development exactions'); *City of Olympia v. Drebick*, [156 Wash 2d 289, 126 P3d 802, 807-08 (2006)] (rejecting the view 'that local governments must base GMA impact fees on individualized assessments of the direct impacts each new development will have on each improvement planned in a service area'); *San Remo Hotel L.P. v. City & County of S.F.*, [27 Cal 4th 643, 117 Cal Rptr 2d 269, 41 P3d 87, 104-05 (2002)] (distinguishing between a fee condition applied to a single property that would be subject to *Nollan/Dolan* review, and a generally applicable development fee); *Home Builders Ass'n of Cent. Ariz. v. City of Scottsdale*, [187 Ariz 479, 930 P2d 993, 1000 (1997)] (finding that *Dolan* does not apply to a generally applicable legislative decision); *and McCarthy v. City of Leawood*, [257 Kan 566, 894 P2d 836, 845 (1995)] (concluding that nothing in *Dolan* supports its application to impact fees); *with Town of Flower Mound v. Stafford Estates Ltd.*, [135 SW3d 620, 636 (Tex 2004)] (finding that the *Nollan/Dolan* analysis is not limited to dedications of land); *and Home Builders Ass'n v. City of Beavercreek*, [89 Ohio St 3d 121, 729 NE2d 349, 356 (2000)] (applying *Nollan/Dolan* in 'evaluating the constitutionality of an impact fee ordinance')."

*McClung*, 548 F3d at 1225.

for which the owner has no constitutional right of recompense." The court stated:

> "Assuming that the doctrine of unconstitutional conditions is limited as the Town argues, a position on which we express no opinion, the Town's argument does not limit the application of *Dolan* because the doctrine was not the only foundation on which it rested and was not even mentioned in *Nollan. Nollan* was grounded entirely in the Supreme Court's takings jurisprudence."

*Id.* at 636.

Of course, as we now know from the Supreme Court's opinion in *Lingle*, the Court's decision in *Nollan* was, indeed, premised on the doctrine of unconstitutional conditions. Understanding that premise, we see a clear distinction between a requirement that a property owner dedicate property to the public and a requirement that a property owner spend money to mitigate the effects of development. In the former circumstance, the government seeks to acquire a landowner's existing real property. To do so, it is required to proceed by the exercise of its power of eminent domain and to pay just compensation. In the latter circumstance, the government does not seek to acquire a landowner's existing real property. It seeks to compel the landowner to pay money to mitigate the effects of development and cannot proceed to do so by instituting eminent domain proceedings. When the landowner makes payment, it does not relinquish existing property; it fulfills a newly imposed monetary obligation. *See* Daniel L. Siegel, *Exactions after* Lingle: *How Basing* Nollan *and* Dolan *on the Unconstitutional Conditions Doctrine Limits Their Scope*, 28 Stan Envtl L J 577, 592-601 (2009) (discussing reasons that subjecting permits conditioned on payment of fees to *Nollan/Dolan* analysis cannot be justified doctrinally after *Lingle*).

That does not mean, of course, that monetary obligations could not, at least theoretically, be "so onerous that, outside the exactions context, they would be deemed *per se* physical takings." *Lingle*, 544 US at 547. In *Lingle*, the Court recognized two circumstances in which governmental regulations that impose economic burdens are considered equivalent to physical takings: (1) where the regulation deprives

the owner of all viable economic use of the property; and (2) where the regulation is so burdensome that the *Penn Central* standard is met. *Id.* at 539-40. It is conceivable that a local government could require, as a condition of development, monetary obligations so burdensome as to deprive the property owner of all economically viable use of the property, or to meet the *Penn Central* standard, as the Ninth Circuit recognized in *McClung*. If a local government did so, such conditions perhaps could be considered sufficiently onerous to be tantamount to physical takings. But in that circumstance, there would be no need for a *Nollan/Dolan* analysis. Conditions imposing burdens of that significance would require payment of just compensation without further inquiry, in contrast to conditions that impose exactions subject to the *Nollan/Dolan* analysis. Under *Nollan/Dolan*, just compensation is required only when the conditions imposed are not "roughly proportional" to the impacts of development. *See* Charles T. Switzer, *Escaping the Takings Maze: Impact Fees and the Limits of the Takings Clause*, 62 Vand L Rev 1315, 1343-44 (2009) (asserting that only conceivable way for impact fee to amount to *per se* physical taking is if the fee imposed is so high that it deprives owner of all economically beneficial use of real property).

In *Lingle*, the Court did not express an intent to treat regulations that impose economic burdens that do not deprive a property owner of all economically viable use of property or meet the *Penn Central* standard as takings under the Fifth Amendment. The Court emphasized, as it had in *Monterey v. De Monte Dunes at Monterey*, 526 US 687, 702, 119 S Ct 1624, 143 L Ed 2d 882 (1999), the "special context" in which *Nollan* and *Dolan* arose and pointedly did not categorize the exactions at issue in *Nollan* and *Dolan* as takings, instead analyzing them under the doctrine of "unconstitutional conditions."

In the absence of a Supreme Court ruling to the contrary, we conclude that a government's requirement that a property owner undertake a monetary obligation that is not roughly proportional to the impacts of its development does not constitute an unconstitutional condition under *Nollan/Dolan* or a taking under the Fifth Amendment, nor does it require payment of just compensation. We also conclude that

a requirement that a property owner construct off-site improvements is the functional equivalent of the imposition of a monetary obligation. When a governmental entity requires a property owner to construct improvements, it simply requires the property owner to put money to a particular use. The government could accomplish the same result by requiring the property owner to pay a specified sum, which the government could then use to construct the improvements. The government, through its exercise of the power of eminent domain, can compel neither off-site construction nor the expenditure of money.

That conclusion does not mean, of course, that a property owner required to construct off-site improvements at a cost not roughly proportional to the impacts of its development may not have some other legally sound basis for a claim against the government. The Takings Clause may not be the only constraint on such governmental action. For instance, prior to *Nollan* and *Dolan*, state courts had invalidated governmental conditions that were not "reasonably related" to the impacts of development without relying on the Takings Clause as the basis of their decisions. *See Dolan*, 512 US at 390-91 (noting that a majority of states have adopted common-law rule that there must be "some reasonable relationship or nexus" between required dedication and impact of proposed development).[18] *See also* Switzer, 62 Vand L Rev at

---

[18] The *Dolan* Court cited with approval the following state law cases as exemplars of the "reasonable relationship" test:

"A number of state courts have * * * require[d] the municipality to show a 'reasonable relationship' between the required dedication and the impact of the proposed development. Typical is the Supreme Court of Nebraska's opinion in *Simpson v. North Platte*, [206 Neb 240, 245, 292 NW2d 297, 301 (1980)], where that court stated:

" 'The distinction, therefore, which must be made between an appropriate exercise of the police power and an improper exercise of eminent domain is whether the requirement has some reasonable relationship or nexus to the use to which the property is being made or is merely being used as an excuse for taking property simply because at that particular moment the landowner is asking the city for some license or permit.'

"Thus, the court held that a city may not require a property owner to dedicate private property for some future public use as a condition of obtaining a building permit when such future use is not 'occasioned by the construction sought to be permitted.' *Id.* at [248, 292 NW2d at 302].

"Some form of the reasonable relationship test has been adopted in many other jurisdictions. *See, e.g., Jordan v. Menomonee Falls*, [28 Wis 2d 608, 137

1332-36 (explaining common-law "dual rational nexus" test used by various courts). Further, as the Court in *Lingle* acknowledged, the Due Process Clause may serve as a check on arbitrary land use regulation. 544 US at 540; *see also Miller Bros. Co. v. Maryland*, 347 US 340, 342, 74 S Ct 535, 98 L Ed 744 (1954) ("It is a venerable if trite observation that seizure of property by the State under pretext of taxation when there is no jurisdiction or power to tax is simple confiscation and a denial of due process of law.").

B. *Did Plaintiff Allege Facts Constituting a Taking Under the Oregon Constitution?*

■ We turn to whether, under the circumstances alleged in plaintiff's first claim for relief, Oregon law recognizes an inverse condemnation action premised on a taking under the Oregon Constitution. In interpreting original provisions of the Oregon Constitution, we apply a now-familiar methodology first articulated in *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992). This court recently summarized that methodology in the context of interpreting Article I, section 18:

> "[W]e consider the text of Article I, section 18, its history, and the cases interpreting it. Our goal in undertaking that inquiry is to identify the historical principles embodied in the constitutional text and to apply those principles faithfully to modern circumstances."

*Coast Range Conifers v. Board of Forestry*, 339 Or 136, 142, 117 P3d 990 (2005) (citations omitted). In *Coast Range Conifers*, this court analyzed Article I, section 18, to address a different issue—whether that clause addressed only physical takings of property, or whether it also extended to

---

NW2d 442 (1965)]; *Collis v. Bloomington*, [310 Minn 5, 246 NW2d 19 (1976)] (requiring a showing of a reasonable relationship between the planned subdivision and the municipality's need for land); *College Station v. Turtle Rock Corp.*, [680 SW2d 802, 807 (Tex 1984)]; *Call v. West Jordan*, [606 P2d 217, 220 (Utah 1979)] (affirming use of the reasonable relation test). Despite any semantical differences, general agreement exists among the courts 'that the dedication should have some reasonable relationship to the needs created by the [development].' *Ibid.* See generally Note, ' *"Take" My Beach Please!*': *Nollan v. California Coastal Commission* and a Rational-Nexus Constitutional Analysis of Development Exactions, [69 B U L Rev 823 (1989)]; *see also Parks v. Watson*, [716 F2d 646, 651-53 (9th Cir 1983)]."

512 US at 390-91.

"regulatory takings." Although the issue was different from that presented in this case, much of the analysis is useful to our analysis here.

As originally adopted, Article I, section 18, provided:

> "Private property shall not be taken for public use, nor the particular services of any man be demanded, without just compensation; nor except in case of the state, without such compensation first assessed and tendered."[19]

*Coast Range Conifers* elucidated that text as follows:

> "Because Article I, section 18, was part of the original Oregon Constitution, we look to the meaning of the words that the framers used. *See Bobo v. Kulongoski*, 338 Or 111, 120, 107 P3d 18 (2005) (looking to dictionary relevant to time constitutional provision adopted). In 1857, the word 'take' meant '[i]n *a general sense*, to get hold or gain possession of a thing in almost any manner.' Noah Webster, *An American Dictionary of the English Language* (1828) (emphasis in original). That definition implies that governmental acts that result in the appropriation of private property for public use will constitute a taking—a conclusion that is consistent with the corollary prohibition in Article I, section 18, against demanding or appropriating the uncompensated services of any person. Webster defined 'property' in 1828 both concretely (as '[a]n estate, whether in lands, goods or money') and more abstractly (as '[t]he exclusive right of possessing, enjoying and disposing of a thing'). *Id.* Put differently, the dictionary definition of property in 1828 was broad enough to include both the tangible or physical thing and the legal interests pertaining to it."

339 Or at 142-43 (footnote omitted).

After exploring the historical circumstances of the enactment and interpretation of Article I, section 18, the

---

[19] Article I, section 18, was amended in 1920 and 1924 to add text defining what constitutes a public use. As a result of those amendments, that constitutional provision currently provides:

> "Private property shall not be taken for public use, nor the particular services of any man be demanded, without just compensation; nor except in the case of the state, without such compensation first assessed and tendered; provided, that the use of all roads, ways and waterways necessary to promote the transportation of the raw products of mine or farm or forest or water for beneficial use or drainage is necessary to the development and welfare of the state and is declared a public use."

court in *Coast Range Conifers* recognized that a "classic" taking occurs when the government physically occupies or appropriates property, but that physically invasive intentional government action also may rise to the level of a taking. *Id.* at 145; *see also Morrison v. Clackamas County*, 141 Or 564, 569, 18 P2d 814 (1933) (government takes property when it intentionally floods private property for public use). The court also acknowledged that Article I, section 18, is not limited to those circumstances, citing the following cases as examples of other governmental acts that effect takings under Article I, section 18: *Boise Cascade Corp. v. Board of Forestry*, 325 Or 185, 198, 935 P2d 411 (1997) (regulations constitute taking if they deny owner any economically viable use of real property); *Dodd v. Hood River County*, 317 Or 172, 182, 855 P2d 608 (1993) (regulatory taking occurs if real property does not retain "some substantial beneficial use"); *Thornburg v. Port of Portland*, 233 Or 178, 192, 376 P2d 100 (1962) (government-authorized overflights constitute taking when they deny owner use and enjoyment of property); *McQuaid v. Portland & V. R'y Co.*, 18 Or 237, 22 P 899 (1889) (government act of placing railway in a public street and thereby denying owner access to street constitutes taking); *accord Iron Works v. O.R. & N. Co.*, 26 Or 224, 228-29, 37 P 1016 (1894) (explaining and applying *McQuaid*). *Coast Range Conifers*, 339 Or at 145.

The court explained that, although the framers may not have anticipated the precise circumstances detailed in those cases, the framers "would have been aware that governmental actions that did not fit precisely within the classic paradigm of a taking still could be 'equivalent to a taking' and thus entitle the owner to compensation." *Id.* at 145-46. Thus, the issue in *Coast Range Conifers* was whether the governmental action at issue—a state wildlife regulation that prevented plaintiff from logging approximately nine acres of a 40-acre parcel that plaintiff alleged "substantially interfered" with its use of its property—was equivalent to the governmental acts that the court had recognized as takings. The court held that, although "[r]egulation in pursuit of public policy" could be "tantamount to a public appropriation of private property," the regulation at issue did not present that circumstance. The court applied the "whole parcel rule" and

held that the challenged rule did not deprive the plaintiff of all economically viable use of the land and therefore did not effect a taking. *Id.* at 147.

The question that this case presents is similar— whether this court will recognize a condition of development that requires construction of off-site improvements as the modern "equivalent" of a physical taking.[20] Plaintiff does not argue that that condition deprives it of all economically viable use of its land or is of comparable severity and thereby is tantamount to a physical taking. Plaintiff contends instead that the city's action constitutes a taking because (1) Article I, section 18, applies to the taking of personal property such as livestock or crops, *see Hawkins v. City of La Grande*, 315 Or 57, 67, 843 P2d 400 (1992); *Coos Bay Oyster Coop. v. Highway Com.*, 219 Or 588, 596, 348 P2d 39 (1959); *Bowden v. Davis et al*, 205 Or 421, 434-35, 289 P2d 1100 (1955) (each so applying Article I, section 18); (2) the materials necessary for plaintiff to construct off-site improvements are personal property; and (3) plaintiff was required to transfer those materials to the city.

Although we agree that Article I, section 18, extends to the taking of personal, as well as real, property, we disagree that the city effected a taking of plaintiff's personal property in this case. As we explained in our analysis of the federal constitution, the city did not acquire personal property that plaintiff owned; it required that plaintiff construct public improvements that previously did not exist. That was the functional equivalent of requiring that plaintiff make a monetary payment to the city for a specific purpose—the construction of public improvements.

At the time that the Oregon Constitution was adopted, there was at least a question about whether the government's imposition of such monetary obligations implicated the power of eminent domain, and arguably a consensus that it did not. In 1851, the New York Court of Appeals considered the constitutionality of special assessments

---

[20] In *Coast Range Conifers*, the court took care to note that the categories of claims that it described "do not exhaust the field; other categories exist," citing, as an example, condemnation blight cases as a discrete category of takings cases. 339 Or at 147 n 12.

imposed to pay the cost of grading and pavement of roads. *People ex rel. Griffin v. City of Brooklyn*, 4 NY 419 (1851). The court began by noting that taxation and eminent domain "rest substantially on the same foundation": In both circumstances, the government takes property for public use, and in both cases, it provides compensation—in the case of taxation, by the protection and increased value presumed to result from the government services paid for by the tax. *Id.* at 422-23. Nevertheless, the court explained, the power of taxation was distinct from the power of eminent domain. One of the distinctions that the court made was that "[m]oney can always be had by taxation; lands can not [*sic*]; and therefore lands may be taken by right of eminent domain, but money may not." *Id.* at 424.[21] The California Supreme Court also noted that distinction in *Emery v. San Francisco Gas Co.*, 28 Cal 345, 350-54 (1865), quoting extensively from *People ex rel. Griffin*, and concluding that "assessments for improvements, upon whatever principle distributed, are not taking private property for public use" because special assessments take only money; "[t]he property referred to in the Constitution for which special compensation must be made, is something other than money, as where land is taken to be used as a street."

In 1867, a legal treatise by the Chief Justice of the Vermont Supreme Court agreed:

"The principal point of difference [in recent cases] has been to determine where taxation ends, and the tenure of the right of eminent domain begins. Since the decision of the

---

[21] The court also explained, however, that equitable apportionment of the assessment—not merely the fact that it involved money—was necessary to its conclusion that the assessment was a tax rather than a taking. The court noted that the expenses of grading and paving the street could have been raised by a general tax, but the legislature had chosen to place the burden on those "whose lands were benefited by the work, and to impose it on them in proportion to the benefit they respectively received therefrom." *Id.* at 425. Specifically, the legislature

"professed to apportion the tax according to the maxim, that 'he who receives the advantage ought to sustain the burthen,' and to exact from each of the parties assessed no more than his just share of the burthen according to this equitable rule of apportionment. The assessment, therefore, was taxation, and not an attempt to exercise the right of eminent domain."

*Id.* Because the assessment was a tax, "any sound objection to the assessment as a tax * * * must be an objection which applies to the principle on which the tax is apportioned[.]" *Id.*

case of [*People ex rel. Griffin*], the courts seem very composedly to have sunk down into the quiet conviction that it is nothing but taxation, and that where the municipal authorities assess the land to its full value for the purpose of assumed improvements, more or less remote from the land, and without regard to the extent of the ratio of equalization, it is still nothing but taxation."

Isaac F. Redfield, 2 *The Law of Railways* 389 (1867) (footnotes omitted). And in 1868, Thomas Cooley also asserted that the right to eminent domain can be exercised over every species of property except money and rights of action. Thomas M. Cooley, *A Treatise on the Constitutional Limitations* 526-27 (1868).

In our view, there is not any logical way to apply a takings analysis to the imposition of new monetary obligations.[22] As the Supreme Court helpfully explained in *Lingle*, a takings analysis assumes that the government has the power to acquire the property taken; it requires only that the government pay just compensation for that property. It does not make sense to say that, although government has the power to impose a monetary obligation, it must repay the value received as just compensation. The real objection that a property owner has to the imposition of a monetary obligation in excess of what is necessary to mitigate the impacts of development is that the government does not have authority to impose such an obligation, or that the obligation offends some statutory or constitutional provision other than Article I, section 18.

When government regulates the use of a property, it effects a taking if it deprives the owner of all economically viable use of the land. In that instance, the regulation of the property is tantamount to the acquisition of the property. When, instead, the regulation requires that the owner pay a sum of money or use a sum of money for a particular purpose, the regulation is not tantamount to acquisition of the property, even when the obligation exceeds the impact of the

---

[22] There is a difference, of course, between a government's imposition of a monetary obligation and its seizure of a discrete monetary fund. *See Brown*, 538 US at 232 (distinguishing between tax and seizure of discrete monetary fund, and noting that, if state had attempted to raise same funds through tax, "there would be no question as to the legitimacy of the use of the public's money").

development, unless, of course, the obligation is so high that it imposes a burden tantamount to acquisition. Absent additional allegations, a property owner that alleges that a local government has conditioned development on construction of off-site improvements at a cost that is not roughly proportional to the impacts of the development, does not allege a taking under Article I, section 18, of the Oregon Constitution. Plaintiff in this case did not allege such additional facts,[23] and, consequently, plaintiff's claim for inverse condemnation under the state constitution was not cognizable in state court.

We answer the Ninth Circuit's second question, as we have rephrased it, as follows: No, a property owner that alleges that a city has required it to construct off-site improvements at a cost that is not "roughly proportional" to the impact of the development, as opposed to dedicating an interest in real property such as granting an easement, does not allege a taking that gives rise to a claim for just compensation.

### III. THE VACATION OF GREENE STREET

■ We now address the Ninth Circuit's third certified question:

> "Under [ORS] 271.120, is a City Council's purported vacation of a street *ultra vires* when the petition for vacation does not comply with the landowner consent provisions of [ORS 271.080]?"[24]

---

[23] To the contrary, the facts included in the Ninth Circuit's certification order disclose that plaintiff had lined up tenants to occupy its corporate park, and the city had agreed to issue temporary occupancy permits. *West Linn Corporate Park LLC v. City of West Linn*, 534 F3d 1091, 1097-98 (9th Cir 2008). Furthermore, the city contends that after it imposed the conditions of development, but before plaintiff acquired the property, plaintiff's predecessor in interest sold the property for a profit of more than $500,000.

[24] The certified question identified ORS 271.120 as the source of the landowner consent provisions. That appears to have been a clerical error on the part of the Ninth Circuit. As the court correctly noted in its discussion of the issues, ORS 271.080 provides the landowner consent requirements at issue. *See West Linn*, 534 F3d at 1105 ("[T]he question we confront is whether Ordinance 1439 was an *ultra vires* act because[,] although the City Council followed procedural formalities in its adoption, the petition presented for its consideration did not fully comply with [ORS] 271.080.").

*West Linn*, 534 F3d at 1105. That question arises because the city contended, in its counterclaim against plaintiff, that an ordinance that the city adopted vacating a portion of Greene Street abutting plaintiff's property is void and of no effect.

As a condition of development, the city required that plaintiff seek vacation of the portion of Greene Street abutting plaintiff's property. Show Timber, an entity that owned and sought to develop land on the opposite side of Greene Street, also was subject to that same condition. As the Ninth Circuit explains in its certification order, Show Timber began the vacation process:

> "In accordance with the City's demand, Show Timber * * * employed engineers to draw up a legal description of the proposed vacation of Greene Street. Thereafter, consent of area property owners was obtained based on the legal description. * * *

> "The proposed vacation was then submitted to the City. However, City planner Eric Spir objected to the proposal, and the City ultimately demanded that Greene Street be vacated in its entirety. The consulting engineers objected to the City's demand because, they reasoned, through traffic on 13th Street would be blocked as a result.

> "Show Timber and [plaintiff] acquiesced. A new legal description was prepared that included the disputed intersection. This second legal description was incorporated into public notices published for proposes [*sic*] of the vacation and the subsequent public hearing on the matter. Following the public hearing, the City Council approved the vacation of Greene Street in its entirety and passed City Ordinance No. 1439, which codified the vacation.

> "[Plaintiff] contends that Ordinance No. 1439 had the full legal effect of vacating Greene Street, and by operation of law, a portion of the intersection vested in it free of any interest held by the City. The City maintains that the ordinance has no legal effect because it was adopted without the consent of all necessary landowners."

*West Linn*, 534 F3d at 1104-05. We understand Ninth Circuit to ask whether the procedural irregularity occasioned by the change in legal descriptions renders the vacation of Greene Street *ultra vires*.

 An act of a city or other governmental entity is *ultra vires* when that act falls outside the entity's corporate powers. *Keeney v. City of Salem*, 150 Or 667, 669-71, 47 P2d 852 (1935). When a governmental entity's power is conferred by statute, actions outside the scope of that power are "extra statutory" and therefore *ultra vires. See, e.g., State v. United States F. & G. Co. et al.*, 125 Or 13, 24-25, 265 P 775 (1928) (so applying to the context of state highway commission). However, where a city has broad power to act, but is required to exercise that power in conformance with certain procedures or limitations, a failure to so conform does not necessarily render a given governmental action *ultra vires*. For example, in *Kernin v. City of Coquille*, 143 Or 127, 135-36, 21 P2d 1078 (1933), the city charter granted the city council authority to contract, but required that it do so through a competitive bidding procedure. When the city failed to follow that procedure, the court held that the doctrine of *ultra vires* was irrelevant: the city possessed "ample power" to enter into contracts. *Id.*

 To determine the extent of a city's power to vacate its streets, the parties direct us to Oregon statute, specifically the provisions of ORS 271.080 to 271.230, for a description of that authority. Those provisions grant cities authority to vacate streets and, relevant to this case, set forth two procedural mechanisms for doing so.[25] One mechanism allows *any person* to initiate a vacation proceeding (ORS 271.080);[26] the

---

[25] A third mechanism applies to vacation of places in cities that are included in port districts. ORS 271.180 - 271.220.

[26] ORS 271.080 provides, in part:

"(1) Whenever any person interested in any real property in an incorporated city in this state desires to vacate all or part of any street, avenue, boulevard, alley, plat, public square or other public place, such person may file a petition therefor setting forth a description of the ground proposed to be vacated, the purpose for which the ground is proposed to be used and the reason for such vacation.

"(2) There shall be appended to such petition, as a part thereof and as a basis for granting the same, the consent of the owners of all abutting property and of not less than two-thirds in area of the real property affected thereby. * * * In the vacation of any plat or part thereof the consent of the owner or owners of two-thirds in area of the property embraced within such plat or part thereof proposed to be vacated shall be sufficient, except where such vacation embraces street area, when, as to such street area the above requirements shall also apply. The consent of the owners of the required amount of property shall be in writing."

other allows a city governing body[27] to do so (ORS 271.130).[28] Both mechanisms call for notice and public hearing and, if the vacation is approved, for enactment of an ordinance vacating the street. ORS 271.110 - 271.130. Another statute expressly provides that the authority granted by those statutes is not exclusive. ORS 271.170.[29] Thus, we can say without hesitation that a city possesses broad power to vacate its streets and that its failure to exercise that power in accordance with specified procedures does not make its action *ultra vires.*

Even if a city has broad power to act, however, its failure to follow required procedures may, in some instances, render its action void and of no effect. Thus, in *Kernin,* although the city's action in entering into a contract was not *ultra vires,* the city's failure to follow competitive bidding procedures required by its charter rendered the contract void. 143 Or at 137. We would not fully address the city's argument

---

[27] ORS 271.005(1) defines "[g]overning body" as "the board or body in which the general legislative power of a political subdivision is vested." The city council in this case meets that definition.

[28] ORS 271.130 provides, in part:

"(1) The city governing body may initiate vacation proceedings authorized by ORS 271.080 and make such vacation without a petition or consent of property owners. Notice shall be given as provided by ORS 271.110, but such vacation shall not be made before the date set for hearing, nor if the owners of a majority of the area affected, computed on the basis provided in ORS 271.080, object in writing thereto, nor shall any street area be vacated without the consent of the owners of the abutting property if the vacation will substantially affect the market value of such property, unless the city governing body provides for paying damages. Provision for paying such damages may be made by a local assessment, or in such other manner as the city charter may provide.

"* * * * *

"(4) Any property owner affected by the order of vacation or the order awarding damages or benefits in such vacation proceedings may appeal to the circuit court of the county where such city is situated in the manner provided by the city charter. If the charter does not provide for such appeal, the appeal shall be taken within the time and in substantially the manner provided for taking an appeal from justice court in civil cases."

[29] ORS 271.170 provides:

"The provisions of ORS 271.080 to 271.160 are alternative to the provisions of the charter of any incorporated city and nothing contained in those statutes shall in anywise affect or impair the charter or other provisions of such cities for the preservation of public access to and from transportation terminals and navigable waters."

in this case if we limited our discussion to the city's broad power to vacate its streets, and we therefore reframe the Ninth Circuit's question as asking whether the city's failure to obtain the consent of affected landowners rendered the vacation ordinance void and of no effect. *See Western Helicopter Services v. Rogerson Aircraft*, 311 Or 361, 370-71, 811 P2d 627 (1991) (recognizing this court's discretion to reframe and restate certified questions).

This court has not always been consistent or clear in defining the circumstances in which a government's procedural violation renders its action void. In *Nyman v. City of Eugene*, 286 Or 47, 53, 593 P2d 515 (1979), the court considered prior decisions that had used the concept of governmental "jurisdiction" to resolve the issue. In some of those cases, the court had deemed statutory requirements to be "jurisdictional" and decided that the failure to comply with those requirements rendered the governmental action void. In other cases, in which the court had concluded that statutory defects were not "jurisdictional," the court had presumed that the governmental proceedings were regular despite alleged noncompliance. *Id.* at 52-53. After surveying those earlier cases, the court in *Nyman* concluded:

> "It is difficult, if not impossible, to determine from these cases why certain statutory requirements are considered 'jurisdictional' and others not. * * * We are now of the opinion that clear analysis in this area requires that we establish criteria for determining what statutory requirements are *indispensable* to the validity of the challenged action * * * and focus * * * on the specific statutory language that permits the government to affect the rights and obligations of its citizens."

*Id.* at 53 (emphasis added).

The parties in this case do not cite *Nyman* in their arguments. Nonetheless, the parties address the test used in *Nyman*—whether the consent procedure that the city failed to follow was indispensible to the vacation of Greene Street (as the city would have it) or merely a minor irregularity (in plaintiff's terms) not affecting the ultimate validity of the vacation.

That analysis requires consideration of the statutory consent procedures and the role that they play in a city's decision to vacate a street. As noted, there are two relevant statutory mechanisms by which a city may vacate a city street. ORS 271.080(1) permits any person to initiate vacation proceedings. Under that provision, the person files a petition "setting forth a description of *the ground* proposed to be vacated, the purpose for which the ground is proposed to be used and the reason for such vacation." (Emphasis added.) ORS 271.080(2) mandates that the person filing the petition append, "as a part thereof and as a basis for granting the same, the consent of the owners of all abutting property and of not less than two-thirds in area of the real property affected thereby." After such a petition is filed, the city either may deny the petition or set a time for formal hearing. ORS 271.100. If the city decides to hold a hearing, it is required to publish notice of the hearing. The notice must include, among other things, *"the ground* covered by the petition." ORS 271.110(1) (emphasis added).

ORS 271.130(1)[30] sets forth a second statutory mechanism by which a city governing body may initiate vacation proceedings. Using that mechanism, a city proceeds without the filing of a petition and attached legal description and without consent of affected landowners. The city gives notice of hearing that includes a description of the street to be vacated to abutting and affected landowners. After hearing, the city may vacate the street unless (1) the abutting landowners do not consent and the vacation will substantially affect the market value of such property, unless the city provides for payment of damages; or (2) a majority of the affected landowners object in writing.

The city argues that, in this case, the city council proceeded according to the mechanism initiated by petition outlined in ORS 271.080(1) but

"did not consider the true 'petition.' * * * Since the 'ground proposed to be vacated' changed by the time of the City Council hearing, it is clear that the City Council considered

[30] ORS 271.130(1) provides, in part: "Notice shall be given as provided by ORS 271.110[.]"

a different 'petition' than the one that was initially filed after obtaining consent."

The consequence of that defect, the city maintains, is that the vacation is "without legal effect," and to hold otherwise would be to eliminate the need for the consent of affected landowners in any vacation proceeding.

Plaintiff argues, on the other hand, that that irregularity is inconsequential. Although the vacation proceedings were initiated by petition and the petition did not describe the disputed intersection, the city's notice of hearing provided the correct description and included the disputed intersection. The abutting landowners, plaintiff and Show Timber, acquiesced in that change, and the record does not disclose a written objection by any affected property owner. Thus, had the city begun the proceedings anew when it decided that vacation of the disputed intersection was warranted, and itself initiated vacation proceedings, the vacation could have been accomplished in accordance with the second mechanism for street vacation outlined in ORS 271.130. When the city revised the street description, it gave affected landowners the same opportunity to file objections to the vacation or to appear at the hearing and oppose the vacation that they would have had had the city used its authority to initiate vacation proceedings from the outset.

Understanding that the consent of affected landowners is significant only when vacation proceedings are initiated by petition, we look to *Nyman* for guidance in assessing the arguments of the parties. *Nyman* involved the widening of a road. There was no affirmative showing that the widening of the road was a public necessity, that plaintiff's predecessor in interest had given written consent to the widening of the road, or that the city had given plaintiff's predecessor notice of the road widening proceeding. 286 Or at 50. The court concluded that, in light of competing legislative goals to ensure that county actions establishing roads are final and unassailable and also that affected property owners receive notice of road proceedings, only the notice requirements were indispensable to the validity of the action. *Id.* at 57. Other statutory requirements that did not render the

notice to the property owners ineffectual did not render the county's action void. *Id.*

Similar competing goals are at play in street vacation proceedings. Street vacation affects title to real property, and stability and certainty in real property records is essential. *Cf. Bitte v. St. Helens*, 251 Or 548, 551, 446 P2d 978 (1968) (holding as untimely an appeal from city-initiated vacation ordinance because, where "[t]itle to real property is involved, * * * orderliness and certainty of procedure are extremely important"). By the same token, Oregon statute clearly makes a provision for notice to property owners affected by street vacation and gives them an opportunity to be heard and oppose vacation. If, after notice, a majority of affected property owners object in writing, the city is precluded from vacating the street. However, consent of property owners prior to notice and hearing is necessary only if vacation is initiated by petition. Oregon statute permits city initiation of vacation proceedings without the prehearing consent of affected landowners. Thus, that consent is not indispensible to city street vacation, and, in answer to the Ninth Circuit's third question, we hold that the absence of such consent does not render the vacation ordinance void and of no effect.[31]

The certified questions are answered.

**KISTLER, J.,** concurring in part and dissenting in part.

West Linn Corporate Park (WLCP) filed this action in state court, claiming that the City of West Linn (the city) took its property in violation of the state and federal constitutions when it required WLCP, as a condition of development, to pay for off-site improvements. The city removed the case to federal court, and the United States Court of Appeals for the Ninth Circuit certified three questions to this court.

---

[31] In reaching that conclusion, we do not decide that affected landowners would not (or in this case did not) have a right to challenge the validity of the city action. The existence of such remedies is not the question that the Ninth Circuit poses. Instead, as we understand it, the Ninth Circuit asks whether the city ordinance, as it stands, is void. We answer that the failure to satisfy the consent requirements of ORS 271.080 does not render the city's otherwise valid exercise of its power void or without legal effect.

*See* ORS 28.200 (authorizing this court to accept certain certified questions). I agree with the majority's answer to the first and third questions but would answer the Ninth Circuit's second question differently. Specifically, I would decline to give an opinion whether requiring off-site improvements constitutes an exaction for the purposes of the Fifth Amendment. Not only does ORS 28.200 limit certified questions to issues of state law, but there is no need for this court to offer the Ninth Circuit our opinion on federal law.

In *Williamson Planning Comm'n v. Hamilton Bank*, 473 US 172, 105 S Ct 3108, 87 L Ed 2d 126 (1985), the Court held that a federal takings claim will not be ripe in two instances. First, a federal regulatory takings claim will "not [be] ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Id.* at 186; *see MacDonald, Sommer & Frates v. Yolo County*, 477 US 340, 351, 106 S Ct 2561, 91 L Ed 2d 285 (1986) (explaining that the resolution of a regulatory takings claim depends on first knowing "the extent of permitted development" on the property). Second, "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the [Fifth Amendment] Just Compensation Clause until it has used the procedure and been denied just compensation." *Id.* at 195.

In its opinion certifying the three questions to us, the Ninth Circuit explained that, in this case, only the second prong noted in *Williamson*—whether Oregon "provides an adequate procedure for seeking just compensation"—is at issue. *West Linn Corporate Park v. City of West Linn*, 534 F3d 1091, 1100 (9th Cir 2008). And the Ninth Circuit's opinion suggests that the first two questions that it has certified are, in its view, necessary to resolve that issue. *Id.* For the reasons explained below, I would give a different answer to the court's second question.

The Ninth Circuit's second question asks whether requiring a property owner to pay for an off-site improvement as a condition of development constitutes an exaction. In explaining its question, the Ninth Circuit notes that the Oregon Court of Appeals held, in one decision, that such a

requirement would constitute an exaction under the Fifth Amendment but, in a later decision, questioned that holding. *See id.* at 1102-04 (discussing Oregon Court of Appeals decisions). As both the majority and I understand the Ninth Circuit's second question, it invites us to explain whether, in our view, requiring a developer to pay for off-site improvements constitutes an exaction under the Fifth Amendment. The majority accepts that invitation. I would decline it.

To the extent that the Ninth Circuit asks for our views on the Fifth Amendment, it asks for more than ORS 28.200 permits us to give. ORS 28.200 provides that we may answer certified questions submitted by other courts to resolve potentially determinative issues of Oregon law. *See* ORS 28.200 (authorizing the Oregon Supreme Court to accept certified questions regarding the "law of this state"); *Western Helicopter Services v. Rogerson Aircraft*, 311 Or 361, 365, 811 P2d 627 (1991) (explaining that the certified question must "concern Oregon law, rather than the law of some other jurisdiction"). As the terms of that statute make clear, we may answer only questions of Oregon, not federal, law.[1]

Nor does *Williamson* require us to give the Ninth Circuit our opinion on federal law. The ripeness concern raised in *Williamson* entailed a more limited inquiry. The substantive issue in *Williamson* was whether a government regulation that temporarily prevented a property owner from using its property constituted a taking in violation of the Fifth Amendment. 473 US at 185 (identifying that issue). The Court observed that the issue was an open one but declined to reach it because the issue was not ripe. *Id.* It explained that a state violated the Fifth Amendment only if it took property without providing an adequate procedure for obtaining just compensation. 473 US at 194-95. The Court noted that, under the applicable state law, a property owner claiming that restrictive zoning constituted a taking could bring an "inverse condemnation" claim in state court to recover just compensation. *See id.* at 196 (discussing Tennessee

---

[1] There may be instances in which answering certified questions of state law requires us to discuss federal law. *See Klamath Irrigation District v. United States*, 348 Or 15, 38 n 15, 227 P3d 1145 (2010). This is not one of them.

law). Without some showing that the state's inverse condemnation procedure was unavailable or inadequate, the existence of that procedure was sufficient for the Court to hold that "until [the property owner] has utilized that procedure, its taking claim [in federal court] is premature." *Id.* at 197.

In *Williamson,* the Court did not ask whether the Tennessee courts would recognize that a temporary deprivation constituted a taking before holding that the property owner's failure to bring its claim in the Tennessee courts meant that its claim in federal court was not ripe. Rather, the Court held that the Fifth Amendment claim that the property owner filed in federal court was not ripe, without regard to whether the property owner would win or lose on the merits of its Fifth Amendment claim in state court. Conversely, when the only remedy available in state court for a temporary taking was a declaratory judgment, and not damages, the Court held that the available state procedures were not adequate to provide "just compensation." *First Lutheran Church v. Los Angeles County,* 482 US 304, 312 and n 6, 107 S Ct 2378, 96 L Ed 2d 250 (1987); *see Williamson,* 473 US at 194 n 13 (suggesting that conclusion). The Court accordingly proceeded to reach the substantive federal question in *First Lutheran*—whether regulations that temporarily deprive a property owner of the use of its property violate the Fifth Amendment—that it had declined to reach in *Williamson.*

In my view, the only question raised by the second prong in *Williamson* is whether the procedures for obtaining just compensation in the Oregon courts are adequate. *Williamson* does not require a federal court to determine how the state court will rule on the merits of the landowner's federal takings claim. Were the rule otherwise, the United States Supreme Court would have asked in *Williamson* whether the Tennessee courts would have recognized a temporary taking before holding that the property owner's failure to bring its takings claim initially in the Tennessee courts meant that its federal takings claim was not ripe. The Court did not do so, and there is no need for us to tell the Ninth Circuit how we would rule on the substantive federal question in this case. It is or should be sufficient to say

that a property owner who alleges that a local government requirement constitutes an exaction that violates the Fifth Amendment may bring that claim in the Oregon courts and receive all the compensation that the Fifth Amendment requires. Answering whether the property owner would win or lose on its substantive federal claim goes beyond what ORS 28.200 permits and *Williamson* requires.

There is a suggestion in the Ninth Circuit's opinion that it views the scope of an "inverse condemnation claim" as presenting a question of state law, even when the source of law that gives rise to that claim is the Fifth Amendment. As a matter of Oregon law, however, there is no claim for "inverse condemnation" as such. *Suess Builders v. City of Beaverton*, 294 Or 254, 258 n 3, 656 P2d 306 (1982). Rather, the phrase "inverse condemnation" is

> "only 'the popular description of a cause of action [which we would now refer to as a claim for relief] against a government defendant to recover the value of property which has been taken in fact by the government defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency.' "

*Id.* (quoting *Thornburg v. Port of Portland*, 233 Or 178, 180 n 1, 376 P2d 100 (1963)); *accord United States v. Clarke*, 445 US 253, 257, 100 S Ct 1127, 63 L Ed 2d 373 (1980). As the court explained in *Suess Builders*, a claim for relief that a government action unconstitutionally took a person's property preceded the use of the phrase "inverse condemnation" as a "popular description" of that claim, 294 Or at 258 n 3, and the nature of the claim turns on the substantive law that gives rise to it, *see First Lutheran*, 482 US at 315 (explaining that form of relief "d[oes] not change the essential nature of the claim"). Describing a claim for relief as an inverse condemnation claim does not convert a claim that finds its source in the federal constitution into a state law claim on which we may offer an opinion pursuant to ORS 28.200. For that reason, I would not answer the Ninth Circuit's second question as the majority does.[2]

---

[2] This case also raises the question of how, if at all, the second prong of *Williamson* applies when a property owner files its takings claim initially in state court, but the defendant removes the case to federal court. That question presents

The Ninth Circuit's first question, by contrast, asks our opinion on an issue of state law. It asks whether a property owner bringing a takings claim for an alleged exaction in state court would first have to exhaust its administrative remedies. Citing the reasons typically advanced for requiring exhaustion of administrative remedies, the majority holds that exhaustion is required in state court as a prerequisite to bringing a takings claim. As the majority correctly clarifies, we would not require exhaustion for a Fifth Amendment takings claim brought pursuant to 42 USC section 1983. *See Patsy v. Florida Board of Regents*, 457 US 496, 516, 102 S Ct 2557, 73 L Ed 2d 172 (1982) (holding that courts may not require exhaustion for actions brought pursuant to section 1983).[3] We would, however, require exhaustion for other claims alleging that an exaction constituted an unconstitutional taking.[4] Some questions remain regarding how that state court exhaustion requirement would affect the issue whether WLCP's federal takings claims are ripe for the purposes of Article III.[5] However, those questions are issues of federal law for the Ninth Circuit.

---

an issue of federal law for the federal courts, and the majority properly declines to address it.

[3] *Williamson* is not to the contrary. The Court was careful to explain in *Williamson*, in discussing the first prong of its ripeness analysis, that the requirement that a property owner apply for a variance or take similar steps before bringing a federal takings claim in federal court was not an exhaustion requirement. 473 US at 192-93. That requirement was instead an aspect of ripeness and resulted from the peculiar nature of a regulatory takings claim; a federal court cannot tell whether a local government regulation goes too far and thus constitutes a taking until the local government has finally decided the extent to which development will be permitted. *Id.*

[4] A landowner may bring a federal takings claim in state court in one of two ways. "[A] landowner is entitled to bring an action in inverse condemnation [for a Fifth Amendment taking] as a result of the self-executing character of the [Fifth Amendment] with respect to compensation." *First Lutheran*, 482 US at 315-16 (internal quotation marks omitted). Alternatively, a landowner may bring a federal takings claim pursuant to section 1983. As the Court explained in *Patsy*, the prohibition against exhaustion derives from congressional intent in enacting section 1983. It does not extend to federal claims brought pursuant to some other claim for relief.

[5] For instance, as long as any Oregon exhaustion requirement is reasonable, it is not clear how the presence or absence of a state court exhaustion requirement affects the question that the second prong of *Williamson* poses—the adequacy of the state judicial procedures for affording just compensation.

For the reasons stated above, I concur in part and dissent in part from the majority's answers to the certified questions.

Linder, J., joins in this concurring and dissenting opinion.